UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Buffalo Wild Wings, Inc.,                          Civil File No. 09-CV-1426 (JMR/SRN)

       Plaintiff,

v.

Buffalo Wings & Rings,

       Defendant.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO AMEND THE PRETRIAL SCHEDULING ORDER**

## INTRODUCTION

Plaintiff Buffalo Wild Wings, Inc. ("Buffalo Wild Wings") respectfully requests

that the Court amend its Pretrial Scheduling Order (Dkt. No. 14) to allow each party to

take twenty depositions. Submitted with this motion is Buffalo Wild Wings' list of

twenty potential deponents based on the information available at this time. *See*

Declaration of Laura L. Myers, dated December 31, 2009 ("Myers Decl."), ¶ 2, Ex. A.

Twenty depositions are necessary because, in addition to BWR corporate employees,

numerous third-party witnesses are needed to fully develop the record.

This case is about Defendant Buffalo Wings & Rings' ("BWR") unlawful use of

trademarks and trade dress confusingly similar to the trademarks and trade dress owned

by Buffalo Wild Wings. Accordingly, BWR's actions in the marketplace are extremely

relevant to this proceeding. BWR's 50-60 franchisees are heavily involved in the day-to-

day marketing, design, and promotional activities of BWR, and possess critical

information the Defendant franchisor admittedly lacks.  BWR franchisees also have first-hand knowledge of customer interactions, specifically instances of actual confusion between BWR and Buffalo Wild Wings.  BWR also conducted at least three market studies utilizing outside vendors and employed an advertising agency to help BWR with its re-branding campaign.  BWR utilized these third-parties in its quest to become more and more like Buffalo Wild Wings.  Consequently, the testimony of these third-party witnesses is highly relevant to this case.

These are only some of the third-party witnesses who possess relevant information.  For these reasons and those set forth more fully below, good cause exists to amend the scheduling order to change the allotted number of depositions to twenty.

<u>**FACTS**</u>

## I.     **THE PARTIES.**

Buffalo Wild Wings owns, operates, and/or franchises approximately 600 Buffalo Wild Wings Grill & Bar® restaurants in 40 states.  Dkt. No. 21, ¶¶ 1, 6.  Buffalo Wild Wings is a family sit-down restaurant and bar featuring chicken wings and other boldly-flavored menu items in a sports-themed atmosphere.  *Id*., ¶ 6.  Buffalo Wild Wings has used the term "Buffalo Wild Wings" since 1982 and has incorporated that term in numerous trademarks.  *See id*., ¶¶ 10-16.  In addition to its trademarks, Buffalo Wild Wings is the owner of inherently distinctive trade dress consisting of a combination of features that combine to create the unique look and feel of Buffalo Wild Wings restaurants.  *Id*., ¶¶ 17-21.

BWR is a franchisor of a family sit-down restaurant and bar featuring chicken wings in a sports-themed atmosphere like its well-known competitor, Buffalo Wild Wings. *Id.*, ¶ 22. BWR's predecessors operated restaurants with a different, non-sports concept in a limited geographic area in and around Ohio. *Id.*, ¶ 23. BWR's predecessor went bankrupt and was acquired by BWR in 2005. Dkt. No. 21, ¶¶ 25-27. Subsequently, BWR embarked on a re-branding campaign that resulted in BWR restaurants becoming more and more like Buffalo Wild Wings. *See id.*, ¶¶ 27-38. BWR adopted a sports-theme, décor, logos and promotions similar to Buffalo Wild Wings. *See id.* When BWR adopted a concept and appearance similar to Buffalo Wild Wings, confusion began to occur. *See, e.g., id.*, ¶ 39.

## II.    THE CLAIMS.

On June 16, 2009, Buffalo Wild Wings filed this lawsuit against BWR. Dkt. No. 1. Buffalo Wild Wings is asserting seven claims: (1) Trademark Infringement in violation of Section 32 of the Lanham Act; (2) Trade Dress Infringement in violation of Section 43(a) of the Lanham Act; (3) False Marking; (4) Refuse Registration of Word Mark Application; (5) Refuse Registration of Design Mark Applications; (6) Violation of Minnesota Deceptive Trade Practices Act; and (7) Unfair Competition. Dkt. No. 21, pp. 12-17. The initial complaint listed BWR's franchisees as John Doe defendants. *See* Dkt. No. 1.

In its Answer, BWR denied most of Buffalo Wild Wings' allegations and asserted ten affirmative defenses and declaratory judgment counterclaims for non-infringement of

service mark and trade dress, non-violation of the Minnesota Deceptive Trade Practices Act, and invalidity of Buffalo Wild Wings' trade dress.  *See* Dkt. No. 3.

## III.    THE COURT'S SCHEDULING ORDER.

The parties disputed the number of depositions that should be allowed at the initial pretrial conference.  BWW sought a deposition of each BWR franchisee plus ten additional depositions.  BWR sought ten depositions per side.  Because the franchisees were not represented at the conference, the Court reserved ruling on the number of franchisee depositions that would be permitted and issued a Pretrial Scheduling Order allowing ten depositions per party.  Dkt. No. 14, p. 2.  The Court indicated that it would revisit the number of permitted depositions at a later date if needed.

The parties subsequently stipulated to an amended complaint that dropped the franchisees as John Doe defendants.

## IV.    THE NEED FOR ADDITIONAL DEPOSITIONS.

This case involves trademark and trade dress infringement at 50-60 different locations across the United States operated by BWR franchisees.  BWR franchisees conduct marketing, design, and promotional activities for BWR restaurants.  In fact, BWR's counsel represented that BWR is unable to produce certain categories of relevant information that it claims is in the possession of its franchisees, rather than the corporate franchisor.  Myers Decl., ¶ 7.  Moreover, as owners and operators of BWR restaurants, BWR's franchisees possess particularized knowledge regarding confusion between BWR and Buffalo Wild Wings and BWR's intent to copy Buffalo Wild Wings.  *Id*., ¶ 8. Accordingly, the testimony of at least a representative sample of BWR franchisees is

necessary to fill the gaps in the knowledge of BWR's corporate employees.  Buffalo Wild Wings has subpoenaed six BWR franchisees for deposition:  one in Rancho Cucamonga, California, three in Columbus, Ohio, and two in the Cincinnati area.

In addition, despite BWR's initial claim that it never conducted formal market studies or surveys, Buffalo Wild Wings learned, through discovery, that BWR conducted at least three market studies.  *See id*., ¶¶ 9-11.  These studies looked at both Buffalo Wild Wings and BWR locations and/or customers and made direct comparisons between the two companies.  *See id*.  One study performed by Lunt Associates found that customers view BWR as a "knock off" of Buffalo Wild Wings.  *Id*., ¶9.  Another suggested that BWR can benefit from the brand awareness of Buffalo Wild Wings.  *Id*., ¶ 10.  The testimony of the third-parties involved with organizing, conducting, and reporting these market studies is highly relevant to the claims and defenses in this case.  Buffalo Wild Wings has scheduled the deposition of the person who oversaw the Lunt Associates study and wishes to depose the authors of the other studies.

BWR also worked with an advertising agency, Elias Savion, to help design and coordinate BWR's re-branding efforts.  Myers Decl., ¶ 12.  This agency was involved in discussions and decision-making regarding BWR's adoption and use of elements of Buffalo Wild Wings' trade dress and marks similar to those of Buffalo Wild Wings.  *Id*. The documents produced thus far indicate that individuals at Elias Savion even warned BWR about using designs elements too similar to those of Buffalo Wild Wings.  *Id*. Consequently, this third-party testimony is extremely relevant.

Finally, there are several additional third-parties with relevant knowledge. For instance, Michelle Brown is an outside marketing consultant BWR used to help organize and launch BWR's sales of its wing sauces. *Id.*, ¶ 13. To do so, Brown reviewed Buffalo Wild Wings' website, visited Buffalo Wild Wings locations, interviewed Buffalo Wild Wings' employees, and analyzed Buffalo Wild Wings' bottling and labeling for its own wing sauces. *Id.* Dave Ports, who was listed on BWR's initial disclosures, is the architect of the majority of BWR's locations, and communicated with franchisees and contractors regarding the locations and design of BWR. *Id.* Monique Lackey is a paid mystery shopper who was scheduled to shop a Buffalo Wild Wings, but went to a BWR instead without ever realizing she was at the wrong place. Additional details regarding these witnesses can be found in the Declaration of Laura L. Myers submitted in support of this motion.

Buffalo Wild Wings sought BWR's consent to increase the number of permitted depositions, but BWR refused to consent. *See* Myers Decl., ¶¶ 3-6, Exs. B-E.

## ARGUMENT

### I.   STANDARD OF REVIEW.

The Court may modify a scheduling order upon a showing of good cause for the modification. Fed R. Civ. P. 16(b)(4); *see also* Local Rule 16.3. However, the question of good cause for modification of a scheduling order does not turn on the existence or absence of prejudice to the non-moving party. *See Luigino's, Inc. v. Pezrow Cos.*, 178 F.R.D. 523, 525 (D. Minn. 1998) ("We need not, however, exhaustively examine the issue of prejudice for, as we have already related, Rule 16(b) is driven by 'good cause' on

the part of the proponent . . . and not by a showing of prejudice on the part of the nonmoving party."). Furthermore, "[a]lthough case management orders are an important tool…'mindless subservience to the dictates' of such an order should not overshadow the Court's fundamental obligation to achieve just adjudication of a civil claim." *In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Lit.*, 2002 WL 31371945 at *5 (D. Minn. Oct. 7, 2002) (quoting *Med. Graphics Corp. v. Hartford Fire Ins. Co.*, 171 F.R.D. 254, 264 (D. Minn. 1997)).

Fed. R. Civ. P. 26(b)(2)(A) allows the Court, by order, to increase the number of depositions permitted by the Federal Rules of Civil Procedure. Under Fed. R. Civ. P. 30(a)(2)(A)(i), in the absence of a stipulation, a party must obtain leave to take more than ten depositions. A party seeking leave to take more depositions than are contemplated by the Court's scheduling order must explain why the additional discovery is necessary. *See Bell v. Fowler,* 99 F.3d 262, 271 (8th Cir. 1996).

As set forth below, good cause exists to amend the scheduling order to increase the number of allotted depositions to twenty in order to ensure full and complete discovery in this case.

## II. GOOD CAUSE EXISTS TO AMEND THE SCHEDULING ORDER TO ALLOW TWENTY DEPOSITIONS PER SIDE BECAUSE THE ADDITIONAL DISCOVERY IS NECESSARY TO FULLY DEVELOP THE RECORD.

There is good cause to allow each side to take up to twenty depositions because numerous third-party witnesses are necessary to establish facts relevant to the claims and defenses in this action. BWR already admitted that it lacks relevant information that is in

the possession, custody and control of its individual franchisees. According to BWR, the franchisees, not the corporate franchisor, retain records of most advertisements, promotions, and customer interactions. Furthermore, BWR's documents show that the franchisees experience regular confusion between BWR and Buffalo Wild Wings. BWR's documents also show that BWR franchisees are often visiting Buffalo Wild Wings locations and reviewing Buffalo Wild Wings materials to obtain ideas for their own stores. Without deposing several franchisees, Buffalo Wild Wings will be unable to determine the true extent of the confusion between the parties and BWR's efforts to copy Buffalo Wild Wings.

It is insufficient to depose only one or two BWR franchisees. The circumstances or occurrences at a particular BWR location may not be representative of the rest of BWR's franchisees. Thus, in order to fully develop the record, it is necessary to depose a fair number of BWR franchisees. At this point, Buffalo Wild Wings is only seeking to depose six BWR franchisees. This number is eminently reasonable given that BWR currently has between 50 and 60 locations.

The testimony of the third-parties BWR used in its massive re-branding efforts is also necessary to accurately establish the facts in this case. Lunt Associates, Marion Nicolet, and Brand Image all conducted market studies that specifically compared BWR to Buffalo Wild Wings and identified strategies for BWR to become more competitive in the marketplace based on that analysis (i.e. more like Buffalo Wild Wings). *See* Myers Decl., ¶¶ 9-11. Accordingly, testimony regarding the methodology of the market studies, the consumer interactions, and the results and recommendations from the individuals who

conducted the studies is critically important.  Without this testimony, Buffalo Wild

Wings is left only with BWR's interpretation of the results and understanding of how

each study was conducted.  This is insufficient to fully understand the true impact of

these market studies.

Similarly, the testimony of the advertising agency who assisted with BWR's re-

branding efforts is also necessary to fully develop the record.  BWR's documents show

that Elias Savion was heavily involved with BWR's decision-making as to which designs

and decorating schemes to adopt.  Some documents even suggest that Elias Savion

warned BWR about choosing design elements too similar to those of Buffalo Wild

Wings, but that BWR continued to do so.  Testimony from Elias Savion is necessary to

fully understand BWR's actions and whether BWR was aware that its conduct may cause

issues with Buffalo Wild Wings.

Finally, Michelle Brown, Dave Ports, and Monique Lackey all possess unique

information relevant to this proceeding.  Michelle Brown was hired by BWR to launch

sales of BWR's wing sauces.  To do so, she researched Buffalo Wild Wings' sales of its

own wing sauces and often recommended that BWR take actions and adopt designs

similar to those of Buffalo Wild Wings.  Dave Ports, as BWR's primary architect, is

heavily involved with communications regarding the design and location of BWR stores.

For instance, Ports described the desired design and feel of BWR as one similar to that of

Buffalo Wild Wings.  *Id*., ¶ 13.  Monique Lackey mistakenly mystery shopped a BWR

and believed she was at a Buffalo Wild Wings during her entire meal and review of the

restaurant. Thus, each of these third-party witnesses are knowledgeable about facts and circumstances to which other witnesses cannot attest.

The total number of depositions of the third-parties listed above is thirteen, already three more than the number of allotted depositions without any BWR corporate witnesses. BWR has three co-owners (Phillip Schram, Nader Masadeh, and Haytham David), which, as BWR's documents make abundantly clear, possess information highly relevant to the claims and defenses in this case. *See* Myers Decl., ¶ 14. BWR's documents also show that Charlie Francus, BWR's Director of Marketing, was heavily involved with the campaign to become more and more like Buffalo Wild Wings. *Id*., ¶ 15. Isabelle Schram, Phillip Shram's wife and the person primarily responsible for BWR's marketing after the acquisition, is one of the few BWR principals who was concerned about BWR branding itself too closely to Buffalo Wild Wings. Myers Decl., ¶ 16. Finally, Roger David is the current CEO of BWR and was involved in the Lunt Associates market study discussed above. *Id*., ¶ 17. Therefore, the testimony of each of these BWR employees is highly relevant to the claims and defenses in this case.

These witnesses, together with the Rule 30(b)(6) deposition of BWR, constitute the twenty depositions Buffalo Wild Wings is requesting. Twenty depositions are already necessary and discovery is only beginning. As more information becomes available during discovery, Buffalo Wild Wings may need to alter or amend its witness list (and may need to seek additional depositions), but Buffalo Wild Wings presently believes that twenty depositions will allow the parties to fully develop the facts.

## **CONCLUSION**

For these reasons, Buffalo Wild Wings respectfully requests that the Court amend the scheduling order to allow each party to take up to twenty depositions.


Dated:  December 31, 2009

    s/Lora M. Friedemann
Lora M. Friedemann (#259615)
*lfriedemann@fredlaw.com*
Laura L. Myers (#387116)
*lmyers@fredlaw.com*
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Phone: (612) 492-7000
Fax: (612) 492-7077

**ATTORNEYS FOR PLAINTIFF
BUFFALO WILD WINGS, INC.**

4669943_1.DOC