UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Buffalo Wild Wings, Inc.,                          Civil File No. 09-CV-1426 (JMR/SRN)
a Minnesota corporation,

                    Plaintiff,

v.

Buffalo Wings & Rings, LLC,

                    Defendant.

## BUFFALO WILD WINGS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR LEAVE TO AMEND AND TO SEEK PUNITIVE DAMAGES

### INTRODUCTION

Plaintiff Buffalo Wild Wings, Inc. ("Buffalo Wild Wings") seeks leave to amend its complaint to assert a claim that arose after the deadline to amend pleadings and to seek punitive damages. In its proposed Second Amended Complaint,[1] Buffalo Wild Wings asks the Court to disallow the recent amendment to Defendant Buffalo Wings & Rings, LLC's ("BWR") trademark Registration No. 1,567,637, which was published on the Principal Register on April 6, 2010. Good cause exists to allow this amendment because the cause of action did not exist prior to the November 1, 2009 deadline to amend pleadings. Buffalo Wild Wings' Second Amended Complaint also seeks punitive

---

[1]    A redlined copy of the proposed Second Amended Complaint is attached to Buffalo Wild Wings' Motion as Exhibit 1 and a "clean" copy of the proposed Second Amended Complaint is attached as Exhibit 2.

damages based on BWR's unfair competition and deliberate disregard of Buffalo Wild Wings' rights.

The parties attempted to agree upon on a stipulation permitting Buffalo Wild Wings to file its Second Amended Complaint, but were unable to do so. After months of negotiation, BWR insisted that it should be allowed to assert new counterclaims after the deadline imposed by the Court's scheduling order even though the new claims do not arise out of the same facts as Buffalo Wild Wings' new claim. Buffalo Wild Wings could not agree to such a proposal, and therefore, is required to bring this motion.

## FACTUAL BACKGROUND

## I.      THE PARTIES AND THE LITIGATION.

Buffalo Wild Wings owns, operates, and/or franchises approximately 660 Buffalo Wild Wings Grill & Bar® restaurants, which are family sit-down restaurants and bars featuring chicken wings and other boldly-flavored menu items. Dkt. No. 21, ¶¶ 1, 6. Buffalo Wild Wings is the owner of numerous trademarks and inherently distinctive trade dress consisting of a combination of features that combine to create the unique look and feel of Buffalo Wild Wings restaurants. *See id*., ¶¶ 10-21.

BWR is a franchisor of family sit-down restaurants and bars featuring chicken wings in a sports-themed atmosphere like its well-known competitor, Buffalo Wild Wings. *Id*. ¶ 22. After it was acquired by its current owners in 2005, BWR embarked on a re-branding campaign that resulted in BWR restaurants becoming more and more like Buffalo Wild Wings. *See id.*, ¶¶ 25-38. When BWR adopted a concept and appearance similar to Buffalo Wild Wings, confusion began to occur. *See id*., ¶ 39.

Thus, on June 16, 2009, Buffalo Wild Wings filed this lawsuit against BWR.  Dkt.

No. 1.  The Court's Pretrial Scheduling Order set the deadline to amend pleadings, except

for the addition of a claim seeking punitive damages, for November 1, 2009.  Dkt. No.

14, p. 2.  Unfortunately, events after November 1, 2009 have made it necessary for

Buffalo Wild Wings to file a Second Amended Complaint.

## II.     THE USPTO RECENTLY GRANTED BWR'S REQUEST TO AMEND ITS TRADEMARK REGISTRATION.

BWR acquired by assignment Registration No. 1,567,637, which was issued on

November 21, 1989.  *See* Dkt. Nos. 38, pp. 3-6 and 39, Ex. A.  On or about August 27,

2009, BWR filed a request under Section 7 of the Trademark Act to amend the trademark

in Registration No. 1,567,637 from the original mark on the left to the mark on the right.

 

*See id.*

BWR requested this amendment despite the fact that BWR and Buffalo Wild

Wings had agreed to stay the opposition proceeding before the Trademark Trial and

Appeal Board ("TTAB") relating to the black and white version of the amended mark

pending the outcome of this litigation.  *See id.*  BWR did not inform the United States

Patent and Trademark Office ("USPTO") that Buffalo Wild Wings had opposed the black

and white version of the amended mark, or that Buffalo Wild Wings is challenging the

mark in this case.  *See id.*  On April 6, 2010, the USPTO granted BWR's request to

amend Registration No. 1,567,637, and issued an amended certificate of registration.  *See id.*; Declaration of Laura L. Myers, dated May 21, 2010 ("Myers Decl.") at ¶ A.

In its proposed Second Amended Complaint, Buffalo Wild Wings challenges the Section 7 amendment to Registration No. 1,567,637 on the grounds that it is a material alteration of the original mark.  *See* Buffalo Wild Wings' Second Amended Complaint, attached as Exhibit 1.

## III.   THE PARTIES WERE UNABLE TO STIPULATE TO BUFFALO WILD WINGS' SECOND AMENDED COMPLAINT.

### A.   Buffalo Wild Wings First Sent BWR A Proposed Amended Complaint On February 3, 2010.

On February 3, 2010, Buffalo Wild Wings sent BWR a proposed second amended complaint with the following changes:

1. Philip Schram was added as a defendant;

2. The description of Buffalo Wild Wings' trade dress was updated to be consistent with Buffalo Wild Wings' supplemental interrogatory answer;

3. The description of BWR's activities was amended to distinguish between the activities of Buffalo Wings & Rings, LLC and its predecessors;

4. Although not required to do so, Buffalo Wild Wings separately plead its claim for BWR's contributory infringement of Buffalo Wild Wings' trademarks and trade dress; and

5. Buffalo Wild Wings' false marking claim was clarified to include BWR's improper use of the ® symbol with the words BUFFALO WINGS & RINGS and with

(which, until recently, was an unregistered mark) and reflect BWR's

franchisees testimony that the improper usage was directed by BWR.

*See* Myers Decl., Ex. B.

BWR responded on February 11, 2010 and agreed to stipulate to Buffalo Wild

Wings' amended complaint without the addition of Mr. Schram as a defendant. *Id*., Ex.

C.  In other words, BWR agreed to stipulate to everything except No. 1 above. *See id.*

**B.     Buffalo Wild Wings Sent BWR A Second Proposed Amended
         Complaint After The USPTO Granted BWR's Section 7 Amendment.**

On March 19, 2010, Buffalo Wild Wings sent BWR another proposed amended

complaint, which was slightly modified due to new developments in the case. *Id*., Ex. D.

There were only three differences between the complaint BWR reviewed in February and

the new version:

1.    Buffalo Wild Wings agreed to remove Mr. Schram as a defendant;

2.    Buffalo Wild Wings asserted a new claim asking the Court to disallow the

amendment to Registration No. 1,567,637 discussed above; and

3.    Buffalo Wild Wings' infringement claim was expanded to include BWR's

infringement of Buffalo Wild Wings' WING TUESDAYS® trademark.

*See id*.

The first change accepted BWR's proposed compromise in February, and the other

two were based on new facts. *Id*. at ¶ 6.  After receiving no response, on March 26,

2010, Buffalo Wild Wings followed up on its request that BWR stipulate to its Second

Amended Complaint.  *Id*., Ex. E.  In its response on March 29, 2010, BWR agreed to stipulate to Buffalo Wild Wings' Second Amended Complaint, but, for the first time, demanded "20 days to respond, otherwise plead and/or assert pertinent claims and counterclaims."  Myers Decl., Ex. F.

### C.   BWR Refused To Stipulate To Buffalo Wild Wings' Second Amended Complaint Unless Buffalo Wild Wings Allowed BWR To Assert Untimely And Overbroad Counterclaims.

On March 31, 2010, Buffalo Wild Wings wrote to BWR and explained that it did not believe that its proposed changes justified the assertion of new defenses or counterclaims, and asked BWR to identify its proposed changes in order to properly evaluate the proposal.  *Id*., Ex. G.  BWR's April 5, 2010 response stated "[w]e are not in a position to provide specific details on what our responsive pleading will include, nor are we obligated to do so at this time."  *Id*., Ex. H.  Later, the parties had a telephone conference during which Buffalo Wild Wings expressed its concern that BWR intended to assert new defenses and counterclaims that do not arise from Buffalo Wild Wings' added claims.  *Id*. at ¶ 11.  BWR agreed to prepare its responsive pleading to allow Buffalo Wild Wings to determine if an issue existed that required further discussion or motion practice.  *Id*.

On April 28, 2010, Buffalo Wild Wings again asked BWR to provide its proposed responsive pleading to allow Buffalo Wild Wings to properly evaluate BWR's proposal.  *Id*., Ex. I.  Two days later, BWR provided the following list of claims it may assert in response to Buffalo Wild Wings' Second Amended Complaint:

1.      A counterclaim seeking cancellation of Buffalo Wild Wings' federal trademark registration for the mark WING TUESDAYS®;

2.      A counterclaim seeking cancellation of Buffalo Wild Wings' federal trademark registration for the mark BUFFALO WILD WINGS AND WECK®; and

3.      A counterclaim seeking cancellation of Buffalo Wild Wings' federal trademark registration for the mark BW-3®.

Myers Decl., Ex. J.  BWR also suggested that it would object to any claim regarding the Section 7 amendment to Registration No. 1,567,637 as futile.  *See id*.

> **D.      The Parties Could Not Reach Agreement With Respect To BWR's Ability To Assert Untimely Counterclaims That Do Not Arise Out Of The Same Operative Facts As Buffalo Wild Wings' New Claims.**

On May 6, 2010, the parties met and conferred via telephone regarding BWR's apparent intention to assert untimely counterclaims that do not arise out of the same operative facts as the new claims in Buffalo Wild Wings' Second Amended Complaint. *Id*. at ¶ 14.  Buffalo Wild Wings informed BWR that it would omit its claim for infringement of the WING TUESDAYS® trademark.  *Id*.  BWR indicated that it would then forgo a counterclaim to cancel the WING TUESDAYS® trademark, but that BWR still intends to assert counterclaims seeking to cancel Buffalo Wild Wings' BUFFALO WILD WINGS AND WECK® and BW-3® marks.  *Id*.  Buffalo Wild Wings explained that it cannot agree to a stipulation that allows BWR to assert counterclaims beyond the deadline imposed by the Court's scheduling order that do not arise out of the same

operative facts as the new claim in Buffalo Wild Wings' Second Amended Complaint,

which was based on events arising after the Court's deadline.[2]  *Id*.

Because the parties could not reach agreement, Buffalo Wild Wings was forced to

bring this motion.  Buffalo Wild Wings is also seeking to amend its complaint to seek

punitive damages based on BWR's unfair competition and deliberate disregard of Buffalo

Wild Wings' rights.

## ARGUMENT

I.  **BWR STIPULATED TO SEVERAL OF BUFFALO WILD WINGS' PROPOSED AMENDMENTS THAT MERELY IMPROVE THE ACCURACY AND CONSISTENCY OF ITS PLEADING.**

Many of Buffalo Wild Wings proposed amendments improve the accuracy and

consistency of its complaint.  Namely, (1) updating the description of Buffalo Wild

Wings' trade dress to be consistent with its interrogatory answer; (2) distinguishing

---

[2]     BWR cannot assert counterclaims that arise out of different facts than Buffalo Wild Wings' new claim without seeking leave to do so.  *See, e.g., Elite Entertainment, Inc. v. Khela Brothers Entertainment*, 227 F.R.D. 444, 446-47 (E.D. Va. 2005) ("[T]he moderate, and most sensible, view is that an amended response may be filed without leave only when the amended complaint changes the theory or scope of the case, and then, the breadth of the changes in the amended response must reflect the breadth of the changes in the amended complaint. . . .  Not only is this moderate approach predominant in the caselaw, the requirement that an amended response reflect the change in theory or scope of the amended complaint is consistent with Rule 15's requirement that an amended pleading must 'plead in response' to the amended pleading.") (citations omitted); *Seitz v. Envirotech Systems Worldwide, Inc.*, 2007 WL 1795678 at *2 (S.D. Tex. Jun. 29, 2007) ("But most courts require leave to raise new allegations and defenses that go beyond responding to the new matters raised in the amended complaint.") (citations omitted); *see also Dairy Foods Inc. v. Farmers Co-Operative Creamery*, 298 F. Supp. 774, 775 (D. Minn. 1969) ("While Weldon was given the right by this court's order of February 3, 1969 to answer or otherwise plead to plaintiff's amended complaint, the court contemplated that any amendments by Weldon should relate to and would be in answer to plaintiff's amended allegations. . . ."); *Intermedics, Inc. v. Cardiac Pacemakers, Inc.*, 1998 WL 35253496 (D. Minn. Jul. 7, 1998).

between the activities of BWR and its predecessors; (3) separately pleading the claim for

BWR's contributory infringement of Buffalo Wild Wings' trademarks and trade dress;

and (4) clarifying that the false marking claim includes BWR's improper use of the ®

symbol with the words BUFFALO WINGS & RINGS and with  (which,

until recently, was an unregistered mark).  BWR agreed to stipulate to each of these

changes in February.  Accordingly, Buffalo Wild Wings will not address these minor

changes upon which the parties have already agreed.

## II.     BUFFALO WILD WINGS SHOULD BE PERMITTED TO ASSERT A CLAIM THAT AROSE AFTER THE DEADLINE TO AMEND.

### A.     Legal Standard.

Rule 15(a) of the Federal Rules of Civil Procedure provides that the Court "should

freely give leave [to amend] when justice so requires."  Indeed, the "purpose of pleadings

is to facilitate a proper decision on the merits," and not to erect formal and burdensome

impediments to the litigation process.  *Conley v. Gibson*, 355 U.S. 41, 48 (1957).  The

Eighth Circuit has held that when a party files a motion to amend after the deadline

provided in a court's pretrial scheduling order, the court may require, pursuant to Federal

Rules of Civil Procedure 16(b), that good cause be shown for leave to amend.  *See, e.g.,*

*Freeman v. Busch*, 349 F.3d 582, 589 (8th Cir. 2003).  Good cause is shown if the

deadline in the existing schedule could not have reasonably been met despite the

diligence of the party seeking the amendment.  *See, e.g., Fabio v. Credit Bureau of*

*Hutchinson, Inc.*, 210 F.R.D. 688, 691 (D. Minn. 2002).

**B.    Buffalo Wild Wings' Claim To Refuse The Amendment To Registration No. 1,567,637 Did Not Arise Until After The Deadline To Amend Pleadings.**

The amended certificate for Registration No. 1,567,637 issued on April 6, 2010. Accordingly, good cause exists to grant Buffalo Wild Wings leave to amend its complaint to add a claim to disallow the amendment to the registration because such a claim did not exist prior to the November 1, 2009 deadline to amend pleadings. Thus, despite its diligence to comply with the Court's order, it was impossible for Buffalo Wild Wings to assert its claim within the prescribed deadline.

Since early March when Buffalo Wild Wings first became aware that the USPTO intended to grant BWR's requested amendment, Buffalo Wild Wings has been diligently working with BWR to procure a stipulation that was acceptable to both parties. When those efforts failed, Buffalo Wild Wings promptly brought this motion.

**C.    Buffalo Wild Wings' Claim To Refuse The Amendment To Registration No. 1,567,637 Is Not Futile.**

Although good cause exists to allow Buffalo Wild Wings to amend its complaint, BWR indicated that it will object to Buffalo Wild Wings' new claim, Count Six in the proposed Second Amended Complaint, as futile.[3]  In its April 30, 2010 letter, BWR stated "we believe any amendment relating to the new cause of action seeking to deny

---

[3]    BWR has not alleged that it will be prejudiced by Buffalo Wild Wings' Second Amended Complaint.  That is because any evidence relating to Buffalo Wild Wings' new claim to refuse the amendment to Registration No. 1,567,637 is in BWR's possession, custody or control and no discovery from Buffalo Wild Wings is necessary. Furthermore, the black and white version of the identical mark has been at issue in this case since the outset.  *See* Count Five of the initial Complaint, Docket No. 1.

USPTO's amendment of defendant's registration is futile because such relief is not legally available."  Myers Decl., Ex. J.

Futility exists if the proposed amended claim fails to state a claim upon which relief can be granted.  *See, e.g., United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa*, 269 F.3d 932, 936 (8th Cir. 2001) ("The denial of leave to amend based on futility means that the court found that the amended complaint failed to state a claim.").  In other words, amended claims are futile if they would not withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See, e.g., DeRoche v. All American Bottling Corp.*, 38 F. Supp.2d 1102, 1106 (D. Minn. 1998).  To defeat a motion to dismiss, a complaint need only allege facts sufficient to state a claim as a matter of law.  *See Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998).

> Contrary to BWR's position, the Lanham Act provides that:
>
> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore cancelled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.

15 U.S.C. § 1119.  Accordingly, the Court has the power to correct the register, including the ability to refuse an amendment that is a material alteration of the original mark.[4]  Thus, BWR's assertion of futility is baseless because Buffalo Wild Wings states a claim upon which relief can be granted.

---

[4]    Amendments to registration certificates are permitted by the applicable rules only if the amended mark is not a material alteration of the original mark.  *See* 15 U.S.C. § 1057(e).

Good cause exists to allow Buffalo Wild Wings leave to amend its complaint to add its claim to refuse the amendment to Registration No. 1,567,637 that did not exist prior to the Court's deadline to amend pleadings.

## III.    BUFFALO WILD WINGS SHOULD BE PERMITTED TO AMEND ITS COMPLAINT TO SEEK PUNITIVE DAMAGES AGAINST BWR.

### A.    Legal Standard To Amend To Add Punitive Damages.

If the moving party makes a prima facie showing of entitlement to punitive damages, a court must permit the moving party to amend the pleadings to add such a claim.  Minn. Stat. § 549.191 (1990).  "The plaintiff is not required to demonstrate an entitlement to punitive damages *per se*, but only an entitlement to allege such damages." *Olson v. Snap Products, Inc.*, 29 F. Supp. 2d 1027, 1034 (D. Minn. 1998) (emphasis added).  In making this determination, the "Court makes no credibility rulings, nor does the Court consider any challenge by cross-examination or otherwise, to Plaintiff's proof." *Id.*  In other words, it does not matter whether the opposing party has asserted affirmative defenses or claims a different version of the facts.  All that is required is that the moving party establish a prima facie case by affidavit or through sworn testimony.  *Olson*, 29 F. Supp. 2d at 1034.

To recover punitive damages, a plaintiff must show by "clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others."  Minn. Stat. § 549.20(1)(a).  A party has acted with "deliberate disregard" if the party

> has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and either (1)

> deliberately proceeds to act in conscious or intentional disregard of the high
> degree of probability of injury to the rights or safety of others or (2)
> deliberately proceeds to act with indifference to the high probability of
> injury to the rights or safety of others.

Minn. Stat. § 549.20(1)(b) (emphasis added).  This standard does not require Buffalo

Wild Wings to prove that BWR intended to do it harm, but only that BWR acted with

malicious, reckless or knowing disregard for Buffalo Wild Wings' rights.  *See, e.g.,*

*Mrozka v. Archdiocese*, 482 N.W.2d 806 (Minn. Ct. App. 1992).

**B.  Punitive Damages Are Available For Buffalo Wild Wings' Unfair
Competition Claim.**

Punitive damages are not available under the Lanham Act.  *See* 15 U.S.C.

§ 1117(a); *see also Minnesota Pet-Breeders, Inc. v. Schell & Kampeter, Inc.*, 843 F.

Supp. 506, 519 (D. Minn. 1993) (citations omitted).  However, punitive damages ***are***

available under Minnesota law for any tort, including unfair competition.  *See Minnesota*

*Pet-Breeders*, 843 F. Supp. at 519; DUNNEL MINN. DIGEST, DAMAGES § 10.02 (4th ed.);

*see also JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910 (7th Cir. 2007) (holding that

punitive damages are available for intentional trademark infringement under state unfair

competition laws).

In *JCW Investments,* the Seventh Circuit affirmed the jury's finding that the

defendant was liable for trademark infringement and upheld the jury's award of punitive

damages under state unfair competition law based on the jury's finding that the

defendant's infringement was willful and wanton.  482 F.3d 910, 914 (7th Cir. 2007).  On

appeal, the defendant argued that the Lanham Act preempts state laws permitting punitive

damages.  *Id*. at 917.  The Court rejected defendant's argument.  In doing so, the Court

pointed out that the "magistrate judge noted that this remained an issue of first impression

because other courts have upheld awards of punitive damages for unfair competition

when a compensatory award was also given under the Lanham Act, but none of the courts

discussed whether punitive damages should be available."[5]  *Id*. at 918 (internal quotations

omitted).  The Court held that "Congress would have acted more clearly if it had intended

to displace state punitive damage remedies," and affirmed the jury's award of punitive

damages under state unfair competition law.  *Id*. at 919.

The Court's decision is consistent with the leading trademark treatise:

> While Lanham Act § 35 does not authorize an additional award of punitive
> damages for willful infringement of a registered trademark or for a
> violation of § 43(a), punitive damages are still available for accompanying
> state, non-federal causes of action for trademark infringement.

J. THOMAS MCCARTHY, 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION

§ 30:97 (4th ed. 2005).

Accordingly, Buffalo Wild Wings' can seek punitive damages for BWR's unfair

competition under Minnesota law.

### C.     The Evidence Shows That BWR Is Unfairly Competing With Buffalo Wild Wings.

Buffalo Wild Wings' state law unfair competition claim arises out of the same

facts as its trademark and trade dress claims.  To prevail, Buffalo Wild Wings needs to

show that BWR has used trademarks and trade dress that are likely to cause confusion

---

[5]     Buffalo Wild Wings is seeking approximately $13 million dollars in damages in
this case, including a disgorgement of BWR's profits to compensate for BWR's unfair
competition and infringement of Buffalo Wild Wings' trademarks and trade dress.

between the parties.  *See, e.g., North Star State Bank of Roseville v. North Star Bank Minnesota*, 361 N.W.2d 889, 894 (Minn. Ct. App. 1985) (explaining that the elements of unfair competition and trademark infringement are the same); *Nitro Leisure Prods., L.L.C. v. Acushnet Co.*, 341 F.3d 1356, 1359 (Fed. Cir. 2003) ("To succeed on the merits of a trademark infringement claim, a plaintiff must show that the defendant used the mark in commerce without its consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake.") (internal quotations and citation omitted); *Gateway, Inc. v. Companion Products, Inc.*, 384 F.3d 503, 507 (8th Cir. 2004) ("[T]o establish a claim for trade dress infringement, [plaintiff] must demonstrate that its trade dress is: (1) inherently distinctive or acquired distinctiveness through secondary meaning; (2) nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product.") (citation omitted).[6]

Not only does the evidence show that BWR's actions are ***likely*** to cause confusion, the evidence shows numerous instances of ***actual*** confusion due to BWR's intentional adoption of trademarks and trade dress similar to Buffalo Wild Wings.

---

[6]     The expert report of Christopher Muller establishes a prima facie case that Buffalo Wild Wings' trade dress is inherently distinctive and nonfunctional.  *See* Myers Decl., Ex. K.

Buffalo Wild Wings has invested millions of dollars developing the Buffalo Wild Wings' brand to convey the unique look and feel depicted in the photos below.

 

  

After BWR's current ownership purchased the franchise in 2005, it began a

massive re-branding campaign to change the look and feel of BWR restaurants from

 

to look more and more like Buffalo Wild Wings:

 

  

BWR's former President and CEO acknowledged before the re-branding occurred that "many customers confuse BWR and BW3." Myers Decl., Ex. L, p. 28.[7]  In another email, Mr. Schram noted "Bwwr is our competition (200 restaurants).  By the way, it is a good mistake, a lot of people confuse the two to our advantage." *Id*.  Another owner of BWR, Nader Masadeh, acknowledged that "the press gets us confused all the times [sic]." *Id*., p. 26.   BWR then adopted marks and trade dress that made it look ***more*** like Buffalo Wild Wings.

Aside from BWR's own admissions of confusion, the evidence shows that BWR's actions have caused actual confusion in the marketplace.  Monique Lackey, a paid mystery shopper, ate at a BWR restaurant and believed she was in a Buffalo Wild Wings the entire time. *See id*., p. 25.  Several Buffalo Wild Wings employees have experienced customer confusion in the form of misdirected phone calls, customers showing up at Buffalo Wild Wings to pick-up orders placed at BWR and visa versa, customers presenting BWR coupons at Buffalo Wild Wings, customers going to Buffalo Wild Wings to meet people who are actually at BWR, BWR mail and deliveries sent to Buffalo Wild Wings and visa versa, etc. *Id*., pp. 22-25, 32, 34-35.  Dale Gallion from Buffalo Wild Wings testified that Buffalo Wild Wings' food distributor drove past a BWR restaurant and was convinced it was Buffalo Wild Wings. *Id*., Ex. M, pp. 45-46.  Mr. Gallion also testified that a woman spoke to him about her visit to a BWR restaurant and adamantly insisted she had been at a Buffalo Wild Wings. *Id*.

---

[7]     Exhibit L is Buffalo Wild Wings' supplemental interrogatory answers, which include citations to the specific documents referenced herein.

Furthermore, internet searches have revealed that consumers are actually confused:

- On August 13, 2009, a blogger on HorsepowerJunkies.com posted the following in a forum discussing the BWR in Morrisville: "I went there 2 times thinking it was BW3's before I found out it wasn't."

  *See* www.horsepowerjunkies.com/forums/showthread.php?p=1178032.

- On ColumbusUnderground.com, a confused consumer wrote "Wait – Is Buffalo Wings and Rings different than Buffalo Wild Wings?  If so, yikes I had no idea . . ." in response to an article discussing the new BWR location on the OSU campus.  *See* www.columbusunderground.com/buffalo-wings-amp-rings-coming-soon-to-campus-area.

- On January 13, 2010, a confused patron at the BWR in Bridgeport, Illinois posted the following review of Buffalo Wings & Rings: "Crappy place, three months ago was a Buffalo Wild Wings.  Still using their menus………food was not good."

  *See* www.centerstagechicago.com/patronreviews/pr.cfm?ID=15851&which=place.

Myers Decl., Ex. L, pp. 35-36.  These are only a few examples of the confusion that has been discovered.  *See id*.

Again, to succeed on its unfair competition and infringement claims, Buffalo Wild Wings need only show that BWR's actions are ***likely*** to cause confusion.  As the examples above illustrate, BWR's actions have caused actual confusion in the marketplace.  Accordingly, Buffalo Wild Wings has established a prima facie case of unfair competition and trademark and trade dress infringement.

**D.        BWR Acted In Deliberate Disregard Of Buffalo Wild Wings' Rights.**

To assert a claim for punitive damages, Buffalo Wild Wings must demonstrate

that BWR's conduct was in deliberate disregard of Buffalo Wild Wings' rights.  *See*

Minn. Stat. § 549.20.  BWR produced numerous documents that show it was aware that

its actions were causing confusion with Buffalo Wild Wings and that despite that

knowledge, BWR continued becoming more and more like Buffalo Wild Wings and

using the confusion between the parties to its advantage.

For example, in an August 6, 2008 email, Charlie Francus, the head of BWR's

marketing department, stated that BWR should "continue to 'draft' behind Buffalo Wild

Wings."  Myers Decl., Ex. L, p. 9.  Mr. Francus noted that it has "worked so far," and

that BWR should "continue to use their success to our advantage."  *Id*.  Mr. Schram's

response to Mr. Francus' email was: "Excellent."  *Id*.  Schram previously acknowledged

that customer confusion is taking place, but wrote that the confusion is "good" because it

works "to our advantage."  *Id*., p. 28.

Numerous other documents show that BWR intentionally copied Buffalo Wild

Wings including, but not limited to, the following:

- A July 19, 2006 email from Mr. Schram references a project to "develop NTN, following the footprints of BW3."

- In 2006, BWR paid for pictures "comparable to the ones that he has shown you in the Buffalo Wild Wings menu."

- In July 2008, Steve Gibson (BWR's Director of Operations) sent an email to two of BWR's owners stating:  "Just left Leonard store, he had 3 tables and 2 at bar.

Then I stopped at BW3 and they had 13 tables and a full bar.  I'm taking some notes.  They have some new tricks at this Bw3."

- In August 2008, Mr. Schram directed Michelle Brown, a marketing consultant,  to the Buffalo Wild Wings website and asked her to create a plan to sell sauces like Buffalo Wild Wings.  Brown billed BWR for 16 hours of "meetings at Buffalo Wild Wings" in October 2008 while she was developing a marketing plan for BWR's sauces.

- In an early visit to the franchisee in Monroe, BWR documented the need to "help owner see the potential of his store ambiance like Wild Wings, music, lighting, TV's etc."

- In July 2009, a Vice-President of BWR, Nader Masadeh, sent images of the "branded look" for Buffalo Wild Wings to the architect for BWR.

- In July 2009, the architect for BWR, David Ports, sent an email to a vendor stating that the "goal is to create a lively environment with brand identity.  Concept is wings, beer and tvs, similar to Wild Wings."

- In May 2008, Mr. Francus posed as a Buffalo Wild Wings customer to obtain information about Buffalo Wild Wings' Free Wings For A Year promotion.  Mr. Francus submitted a request for information to the Buffalo Wild Wings website indicating that he was "thinking about camping out but I wanted to get some of the details first."  Buffalo Wild Wings responded and explained how the promotion works.  BWR subsequently had a "free wings for a year" promotion like Buffalo Wild Wings.

- In April 2009, an email was sent among BWR representatives which states, "I am meeting Greg who works at our Beechmont store tomorrow at BW3 in Milford at 12 PM for lunch, and to check out the store. The idea is to find out where his head is at and open his eyes to things BW3 is doing that help make them successful."

- The business plan for BWR states simply, "Our culture is: copy the best." BWR copied Buffalo Wild Wings' site selection criteria in the business plan.

*See id.*, pp. 9-19; *see also id.*, Ex. N, pp. 162:3 – 165:25.

BWR's intentional infringement is part of a larger pattern of bad acting. Schram, BWR's then President and CEO, obtained copies of Buffalo Wild Wings' confidential business records from a former employee. Myers Decl., Ex. L, p. 10. A colleague suggested that BWR return the materials to BWW, but Schram refused saying the records are "valuable" and that he did not want to lose them. *See id.* Schram kept the records even after Buffalo Wild Wings asked for them back. *Id.* at ¶ 19.

As noted above, BWR permitted its marketing manager to pose as a Buffalo Wild Wings customer to obtain information from Buffalo Wild Wings. When confronted with this evidence, a master developer for BWR, Frank Nunziata, testified that he believed Francus' conduct was "funny." *Id.*, Ex. O, pp. 154:16 – 155:5.

Finally, Buffalo Wild Wings served interrogatories asking BWR to identify all instances of confusion. *Id.*, Ex. P, p. 4. BWR responded, under oath, that it is aware of no instances of confusion and no documents that reflect confusion. *See id.* BWR's sworn interrogatory answers stand in sharp contrast with the numerous admissions and instances of confusion reflected BWR's own documents. *See id.*, Ex. L.

22

There is overwhelming evidence that BWR is intentionally infringing Buffalo Wild Wings' trademarks and trade dress and acting with deliberate disregard of Buffalo Wild Wings' rights. *See Ansari v. NCS Pearson, Inc.*, 2009 WL 2337137 at *12 (D. Minn. Jul. 23, 2009) ("To establish 'deliberate disregard,' [plaintiff] must produce evidence that the actions of the defendant were intentional, not simply careless or negligent.") (citing *Hern v. Bankers Rights Cas. Co.*, 133 F. Supp.2d 1130, 1135 (D. Minn. 2001)).  Thus, Buffalo Wild Wings should be permitted to amend its complaint to seek punitive damages.

## CONCLUSION

For these reasons, Buffalo Wild Wings respectfully requests the Court to grant it leave to amend its complaint to improve the accuracy and consistency of its pleading, to add a claim to refuse the amendment of Registration No. 1,567,637, and to seek punitive damages for BWR's unfair competition and deliberate disregard of Buffalo Wild Wings' rights.

Dated:  May 21, 2010

  s/Lora M. Friedemann
Lora M. Friedemann (#259615)
lfriedemann@fredlaw.com
Laura L. Myers (#387116)
lmyers@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Phone: (612) 492-7000
Fax: (612) 492-7077

**ATTORNEYS FOR PLAINTIFF**
**BUFFALO WILD WINGS, INC.**

4740872_1.DOC