UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Buffalo Wild Wings, Inc.,                           Civil Action 09-CV-1426 (JRT/SRN)
a Minnesota corporation,

        Plaintiff,

v.

Buffalo Wings & Rings,

        Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This is a case of two buffalo chicken wing restaurants operating under equally descriptive names. The Plaintiff, originally known as "Buffalo Wild Wings & Weck" and the Defendant, originally and still known as "Buffalo Wings & Rings," both set out in Ohio in the 1980s with similar aspirations to build and grow their respective chains of buffalo wing restaurants. Having had several opportunities in the past thirty years to pick a stronger trademark for its buffalo wing restaurants, Plaintiff ultimately moved to the weakest mark of all. Now, with more than 600 restaurants in operation, instead of incurring the cost and aggravation of changing its brand once again, Plaintiff has decided to engage four federal courts in its effort to stop a competitor from using "buffalo wings" in its name. The confounding problem for Plaintiff is that the Lanham Act granted

Defendant an incontestable right to use its mark Buffalo Wings & Rings 15 years ago. Apparently dissatisfied with its poor trademark choice and the impossible hurdle presented by an incontestable mark, Plaintiff attempts to use this litigation and three other similar cases against BWR franchisees in other jurisdictions to stop otherwise fair competition.

After competing without incident for two decades, Plaintiff Buffalo Wild Wings, Inc. ("BWW") now claims that the name and mark that Defendant Buffalo Wings & Rings ("BWR") has been using as part of its federally-registered trademark for more than 20 years is infringing on BWW's marks. BWW also has asserted a "trade dress" claim seeking to prevent defendant from using such generic, functional concepts as "prominent use of the color yellow," "wide open interior with spacious feel," and "heavy emphasis on sports and television."

Remarkably, shortly before the commencement of this action BWW expressly represented that the incontestable mark that BWW now claims is infringing was "acceptable" to BWW. It is not clear what caused the abrupt about-face in BWW's position.[1]  What is clear is that BWW's infringement claims have no merit.

While BWW's claims have changed throughout this case, the most recent version of its Complaint filed just two days ago asserts the following causes of action:  1) trademark infringement; 2) trade dress infringement; 3) false marking; 4) refuse

---

[1] The situation where a much larger company attempts to drive a smaller competitor out of the market through trademark infringement claims is not uncommon and has recently resulted in action by Congress.  *See* D. Karau*, Cease and Desist Letter from an 800 Pound "Monster" Results in Action by Congress*, at www.fredlaw.com/areas/trademark/trade_1002_drk4.html.

registration of word mark application; 5) refuse registration of design mark applications; 6) refuse amendment to registration 1,567,637; 7) violation of Minnesota Deceptive Trade Practices Act; and 8) "unfair competition." (*See* Doc. No. 142).

These claims fail because BWW does not have any protectable legal rights that are superior to BWR with respect to its trademarks or any legally-protected rights in its alleged trade dress.   Indeed, BWW seeks to effectively cancel BWR's incontestable registered trademark without even asserting a cancellation claim or alleging any statutory basis for doing so under the Lanham Act.

Specifically, BWW's claims fail on a number of independent legal grounds, including:

- BWR has a United States service mark first registered in 1989 and recognized as "incontestable" by the Commissioner for Trademarks 15 years ago.

- BWR has a priority of usage over the name and marks that BWW did not register until 1997.

- BWW has expressly disclaimed, and the United States Patent and Trademark Office ("USPTO") has expressly found, that it has no right to exclusively use or protect the terms "buffalo" and "wings," the only two terms that it claims are infringing on its marks.

- BWW is not entitled to an order requiring the Commissioner of Trademarks to revoke an amendment to BWR's '637 Registration where it has not even alleged a statutory or common law basis for challenging USPTO's approval of the amendment.

- BWW has insufficient evidence of consumer confusion and no market survey evidence in a case involving hundreds of restaurants with millions of customers throughout the United States.

- BWW has come forward with no evidence that any allegedly infringing conduct by BWR *caused* any consumer confusion, particularly in light of the undisputed fact that it was BWW that changed its name from "BW-3" to "Buffalo Wild Wings" in 1997.

- BWW has no legally-protectable trade dress rights in such functional, generic concepts such as a primary color, use of big screen televisions and sports themes, and BWR is not infringing on such alleged trade dress.

- BWW's two purported State law claims arising out of the same conduct fail for the same reasons, and no independent cause of action for "unfair competition" exists in Minnesota.

- There is no legally recognized cause of action for "false marking" arising out of the alleged improper use of the ® symbol.

- Even if BWW could adequately support any of its claims arising out of alleged infringement, all such claims are barred  as a matter of law by the doctrines of laches and equitable estoppel because it cannot be disputed that BWR has been using the name "Buffalo Wings & Rings" and its registered mark since at least 1988 without objection from BWW.  Moreover, with respect to claims by BWW that seek to deny BWR's pending service mark applications covering variations of

its mark "Buffalo Wings & Rings," failure by BWW to ever challenge BWR's now incontestable mark or registration also is an equitable bar to opposition.

In support of this motion, BWR relies primarily on USPTO documents, BWW's own documents and testimony, and other historical photographs and evidence that cannot be genuinely disputed.   BWW simply does not have legally superior rights that would support any claim that BWR is infringing on its trademarks or trade dress.

## STATEMENT OF UNDISPUTED FACTS

### The Parties

### Buffalo Wild Wings

Buffalo Wild Wings is a publicly-traded corporation and one of the largest restaurant chains in the United States with over 600 restaurants in more than 40 states and annual revenues of $538 million. (Ex. 1,[2] p.2-3.) Its restaurants feature buffalo-style chicken wings in a casual, sports bar type of environment.  (*Id*., p. 1; Doc. No. 21, ¶ 6.) Buffalo Wild Wings began doing business in 1982 in Ohio as "Buffalo Wild Wings & Weck."  (Ex. 1, p.1.)   BWW began franchising its restaurants in 1991.  (*Id*.)   After several years of struggling with financial and management issues, BWW brought in new management in 1994 and soon thereafter the company began to grow rapidly.  (Ex. 2, 37:19-38:1; Ex. 3, 5:13-15, 23-25, 29:1-32:23, 34:8-35:4.)   It changed its name from "BW-3" to "Buffalo Wild Wings" in 1997 and went public in 2003.  (Ex. 1, p.1; Ex. 2, 27:13-20; Ex. 3, 41:18-42:7.)

---

[2] Unless otherwise noted, all referenced exhibits are attached to the Declaration of Nicole Delaney filed herewith.

**Buffalo Wings & Rings**

Buffalo Wings & Rings opened its first location in Cincinnati, Ohio in 1988.  (Ex. 4, p.1.)  In 1989, BWR's predecessor, Wings & Rings, Inc., began franchising Buffalo Wings & Rings restaurants.  (*Id*.)  Throughout the 1990s, BWR grew to approximately 25 restaurants in several states.  In the late 1990s and early 2000s, however, BWR began struggling financially and by the beginning of 2005 only eight Buffalo Wings & Rings restaurants remained.  (Ex. A to Doc. No. 72, p.16.)

In 2005, the assets of the franchisor of the Buffalo Wings & Rings restaurants, Wings & Rings, Inc., were sold to a group of three investors, Haytham David, Nader Masadeh and Phillipe Schram.  (*See* Doc. No. 21, ¶27.)  Mr. David had many years of experience in the restaurant business, including owning Buffalo Wings & Rings franchises.  (Ex. 4, p.3.)  Mr. Masadeh and his family had been involved in the restaurant business for many years, including owning and operating a Buffalo Wings & Rings restaurant.  (Ex. 5, 14:6-23.)  In 2005, he decided to leave a high level position with a Fortune 500 company in order to pursue his dream of starting his own business.  (Ex. 4, p.2-3.)  Mr. Schram also left a prominent position with a large corporation in order to pursue his dream of owning and developing his own business.  (Ex. 4, p.2; Ex. 6, 8:12-20, 9:15-19.)

After the new investors purchased the company in 2005, BWR began expanding again.  (Ex. 7, 40:20-25.)  From the eight stores that existed in 2005, the company grew back to more than 25 by the end of 2007.  (*Id*.)  BWR also began franchising again in states outside Ohio.  (Ex. 4.)  BWR currently has approximately 55 restaurants in more

than a dozen states.  (Ex. 7, 72:11-13; Ex. 8.)  Its restaurants feature buffalo-style chicken wings and "curly" fried potatoes in a casual, family restaurant environment.  (Ex. 4, p.1.)

**The Marks at Issue**

BWW claims that BWR is infringing on both the name "Buffalo Wild Wings" and its design marks which primarily feature the side view of a buffalo with attached wings on a yellow partial circle background.  (Doc. No. 21, p.4.)

**History of BWW Name**

According to BWW's own published history of the restaurant chain, it started doing business in 1982 in Columbus, Ohio under the name "Buffalo Wild Wings & Weck."  (Ex. 1, p.1; Ex. 2, 15:1-21, 18:1-12.)   The name described the fact that the restaurant featured "Buffalo N.Y. Style Chicken Wings" - Ex. 3, 56:18-57:4 and below:



### THE bw-3 STORY

**Buffalo Wild Wings & Weck (bw-3)**, was established in 1982 by three friends who had lived in Buffalo N.Y. for many years. They agreed that, the chicken wings and other famous Buffalo N.Y. foods they had enjoyed for so long should be very popular in other parts of the country! Their main concern was not only how to bring these fine foods out of the Buffalo area, but also, how to bring Buffalo's friendly party atmosphere along with them! This was no small task considering their inexperience in the restaurant field!

However, their drive, entrepreneurial spirit, and **most of all their many new found friends in Columbus, Ohio** (the location of their 1st store) made what seemed impossible, possible! In fact, the boys found that when it comes to eating wings, no matter where you are it's one **big party!**

While **bw-3** cannot take the credit for the original idea, we are proud of our unique atmosphere, menu, and the famous **bw-3** signature **sauces** that have made our wings **the best in the land.**

But, no story would be complete without a small dedication to the woman who invented **Buffalo N.Y. Style Chicken Wings.**

We at **bw-3** salute **Teresa Bellissimo** and are sure she would approve of Buffalo Wild Wings & Weck!

**How About You!**

**P.S.** Thanks to all of **bw-3's** friends, we are proud to announce the opening of our newest locations:

**Cincinnati, Ohio**

**Steamboat Springs, Colo.**

**Bloomington, Ind.**

And we thank you for your support.

(BWW001829-color)                    (Ex. 12, BWW000222.)

In 1987, the company began using the name "BW-3" for its restaurants.  (Ex. 9, 10.)  In 1987, the corporate predecessor entity, J.M.S. Associates, Inc., registered with the USPTO the marks "BW-3" and "Buffalo Wild Wings & Weck."  (Ex. 9-12.)  In 1995, J.M.S. Associates, Inc. changed its corporate name to BW-3, Inc., to reflect the name of

its restaurants.  (Ex. 13.)  The company continued to operate its restaurants under the name "BW-3" until 1997, when it again changed its name to "Buffalo Wild Wings."  (Ex. 3, 41:18-42:7; Ex. 14, 15.)  In 1997, BWW first sought to register this revised name and represented to the USPTO in a sworn statement that the first use of its mark was in 1997.[3] (Ex. 14, 15.)

**History of BWW Design Marks**

According to its own published history, BWW initially operated under the following "wingless buffalo" design mark:


(Ex. 16, 17.)

In 1997, BWW filed for the registration of a new "winged buffalo" design mark, which it represented to the USPTO it first began using in 1997:


(Ex 18.)

---

[3] In order to avoid the reality that BWR was using the name "Buffalo Wings & Rings" long before BWW was using "Buffalo Wild Wings," BWW now claims that it used the name "Buffalo Wild Wings" since 1982 because those words are included within the name of "Buffalo Wild Wings & Weck."  BWW's own U.S. trademark applications, however, clearly state that the first use of this name was not until 1997, and no BWW witness could identify any restaurant that operated under the name "Buffalo Wild Wings" without the term "Weck" before 1997.  *See, e.g.,* Ex. 3 at 78:15-22.

BWW has also registered several similar marks which always feature a full view of a side profile of a winged buffalo. (Ex. 19-21.) In all such registration applications, BWW always represented to the USPTO that its first use of the mark was 1997 or later. (*Id*.)

Notably, BWW has expressly and repeatedly disclaimed any legal rights to the exclusive use of the words "Buffalo" and "Wings" apart from its mark in its filings with the USPTO. (Ex. 14, 18, 22-25.) For example, in its application for its word mark "Buffalo Wild Wings" for sauces, the USPTO Examiner required entry of a disclaimer into the record, directing BWW to its previous registrations in which the terms had been disclaimed. (Ex. 26) BWW attempted to argue that the words were not descriptive as applied to sauces. (*Id*.) The argument failed. (Ex. 23; Ex. 3, 67:5-13.) Indeed, the USPTO has repeatedly required BWW to disclaim any rights in these terms and has expressly rejected BWW's attempts to claim otherwise. (Ex. 14, 18, 22-25.)

**History of BWR Name**

In stark contrast to BWW's multiple name changes, BWR has operated its restaurants under its brand "Buffalo Wings & Rings" since it opened its first restaurant in 1988:





(Ex. 27.)

(Ex. 27.)

The "Buffalo Wings & Rings" assumed name was registered with the Ohio Secretary of State with a date of first use of 1988. (Ex. 28.)  In addition, in 1988, BWR filed an application with USPTO to register its words plus design mark which prominently featured the name "Buffalo Wings & Rings" and a forward facing head of a buffalo:



(Ex. 29.)                    (ROS000001.)

In 1989 the USPTO granted BWR's registration request as Registration No. 1,567,637 ('637 Mark). (Ex. 29.)  In 1995, BWR filed a combined Declaration of Use and Petition for Incontestability.  (Exs. 30; 31; 32, p.2.)  The Commissioner for Trademark accepted the Declaration and acknowledged the Petition for Incontestability in January 1996. (Ex. 31.)  In 1999, BWR filed a Renewal Application for the '637 Mark. (Ex. 33.)  Over the next two decades BWR used the '637 Mark in commerce as follows:



(Ex 33.)

As can be noted from the photographs depicting BWR's first restaurant and menu, in addition to its words plus design mark, the words only mark "Buffalo Wings & Rings" simultaneously was used with its design mark.  (Ex. 29; see above BWRLLC00130548 and BWRLLC00134526.)

In 2007, the new ownership of BWR hired an outside advertising agency to assist it in modernizing and refreshing its logos, signage and marketing materials.  (Ex. 5, 176:1-5, 177:5-178:3.)  After filing several new service mark applications with USPTO covering the various alternatives of its modernized words *plus* design mark, BWR eventually settled on an updated version of its original 1989 '637 Mark which featured the color red and which has been used by BWR since 2008 in new signage and marketing materials:



(Ex. 5, 192-193, 199:1-21.)   In 2009, BWR filed an application to amend its incontestable '637 Mark to reflect the updated look.  (Ex. 34.)  BWW knew about the application, but did not file an objection with the USPTO.  (Ex. 35, 81:1-83:15.)  The USPTO granted BWR's application to amend, issued an amended certificate of registration, and the updated red logo is now registered with the USPTO as an amendment to the 1989 '637 Mark.  (Ex. 36.)

**BWW Trade Dress**

BWW has changed the definition of its claimed "trade dress" at least three times during the pendency of this action.  The changes are tracked as follows:

- Stylized buffalo images

- Prominent use of buffalo images within a concentric circle

- Prominent use of the color yellow

- Wide open interior with a spacious feel

- ~~High ceilings painted black~~

- ~~Framed company advertisements used as wall hangings~~

- Heavy emphasis on sports and television

- Branded décor

- ~~Nightly~~ Branded signature promotions

- ~~Playful, casual block letters on signs and menus~~Bold, branded font

- Use of ~~the phrase "grill and bar" rather than the typical phrase "bar and grill"~~bold patterns as design elements

(Doc. No. 1 at ¶ 19; Doc. No. 142, 2nd Am. Compl. at ¶ 19.)

The report of BWW's proposed trade dress expert, Christopher Muller, uses yet another definition of trade dress, which includes elements not mentioned above, including BWW's packaging of its sauces and its "service style."   (Ex. 37, p.7-8.). Further, while BWW's CEO, Sally Smith, testified that BWW's definition of its trade dress should have also included the primary colors red and green, among other items, John Hinz, BWW's VP of Marketing testified that he did not believe green was used in BWW restaurants.  (Ex. 3, 205:6-17; Ex. 38, 28:2-29:1.)

Despite the fact that BWW claims it has been using this "distinctive" trade dress since at least 2001, it has never attempted to register its trade dress with the USPTO, as other established restaurant chains have done.  (*See* Ex. 39, 40.)  BWW witnesses admit that many of the features it claims make up its "trade dress" are used by other casual restaurants/sports bars (Ex. 2, 50:24-51:9, 55:13-17, 59:22-60:14; Ex. 3, 210:7-18, 211:14-212:1, 212:19-213:10, 226:6-13, 226:22-227:1.)

**BWR Trade Dress**

Beyond the generic features that are present in almost all casual restaurants/sports bars, such as televisions, sports memorabilia and promotional material, BWW and BWR have significant differences in key elements of their trade dress and décor.  BWW has a sleek, modern and sanitized look which employs light colored wood and modern furniture and lighting fixtures.  (Ex. 2, 123:1-4; Ex. 37, p.9-11.)  BWR has a rustic look with dark wood trim and furnishings, traditional furniture, heavy use of corrugated metal and "wash bucket" lighting.  (Ex. 2, 106:3-10, 119:8-11, 123:22-124:3; Ex. 41.)

BWR                          BWW













BWR serves its buffalo wings and other items on plates and in bowls, while BWW uses paper baskets.  (Doc. No. 126 at p.12.)

While BWW alleges that it predominantly uses the color yellow, the evidence in the case including photographs and the testimony of BWW's own CEO confirms that the interiors of its restaurants vary significantly from one restaurant to another in terms of color schemes.  (Ex. 3, 175:6-177:5, 179:9-180:9, 182:4-183:22, 186:7-187:17, 192:7-20.)  BWW often uses yellow as part of a black "checkerboard" pattern.  (*See* photo above BWRLLC00134401.)  Checkerboard patterns are not a feature of any BWR interior or exterior décor.  (*See* photos above.)  BWR, in contrast to BWW, uses the colors Navaho red, forest green and golden nugget on the interior of its restaurants.  (Ex. 41.)  BWR interior walls also prominently feature corrugated, steel paneling, which BWW does not use.  (Ex. 2, 105:19-106:3, 119:8-11, 123:12-17.)

**Competitive Marketplace**

In order to evaluate the trademark/trade dress infringement claims at issue in this case, it is necessary to have some understanding of the competitive marketplace.  Apart from the countless restaurants which provide a casual dining/sports bar atmosphere, there

are a significant number of these restaurants which feature buffalo wings as a menu item. (Ex. 32, Ex.15a to 15s of Dillon Report.) Not surprisingly, many of these restaurants feature the words "buffalo" and/or "wings," in their names. (*Id.*)  Many of these restaurants use buffalo images in logos, signage or other materials. (*Id.*)

Competitors in this market segment, like many other markets, often conduct competitive analysis of other restaurants. (Doc. No 126, p.2.)  BWW's own witnesses and documents demonstrate that it has conducted competitive analysis of other restaurants in the marketplace, including BWR. (Ex. 42, 95:22–98:16).  This includes visiting other restaurants and comparisons of pricing and other items. (*Id.*)

**BWW First Raises Objections to BWR**

After competing against one another in various markets for 20 years, in 2008, BWW began objecting for the first time to BWR's trade dress as infringing. (Ex. 43.)  In 2005-2007, BWR experienced significant growth, more than tripling the number of its restaurants.  (Ex. 4, p.5-6; Ex. 7, 40:20-25.) In the beginning of 2008, BWW sent a "cease and desist" letter to BWR.  (Ex. 43.)  In this letter, BWW claims for the first time that BWR was infringing on various features of its trade dress.  (*Id.*)  BWW did *not* contend, as it does now, that the name "Buffalo Wings & Rings" or the front-facing buffalo head that has been a part of BWR's registered mark since 1989 infringed on any of BWW's marks.  (*Id.*)  The focus of the letter was the use of the color yellow.  (*Id.*)

**The Parties Attempt to Resolve their Dispute**

In 2008 and early 2009, the parties attempted to resolve any differences. (Ex. 44-49.)  The documentation regarding the discussions between the parties, most of which is

18

authored by BWW's own legal counsel, is remarkable because BWW *expressly agrees to BWR's use of its name and updated logo that it now claims is infringing*. (Ex. 46, 47.) In letters and draft Settlement Agreements drafted by BWW's legal counsel, it specifically represented to BWR that the use of the name "Buffalo Wings & Rings" and the updated logo were "acceptable" to BWW. (*Id.*) For example, in a letter dated July 7, 2008, counsel for BWW stated that the new image was "acceptable" and viewed it as a step toward "complete resolution" of the dispute. (Ex. 46.)

In addition, in a draft Settlement Agreement prepared by BWW's counsel, it specifically cited the following examples as "acceptable" use which included BWR's name, updated logo and numerous other materials that it now claims are infringing (Ex. 48):



BWR specifically relied on the representations in counsel for BWW's letter and the agreement he drafted that the use of its updated logo was "acceptable" as long as it did not use yellow as a predominate color. (Ex. 5, 88:5-89:10, 192-193, 199:1-21.) Even before reaching any formal agreement with BWW, BWR devoted a great deal of time,

effort and expense in changing its signage, menus and other marketing materials to using the modernized red logo on a going forward basis.  (*Id*.)

After assuming that the matter was resolved and the agreement prepared by BWW only needed to be formally executed, BWW's legal counsel sent a letter on April 9, 2009, suddenly changing its settlement position.  (Ex. 49.)  The letter purports to rely on new information, but most of the "new" information related to restaurants that had been in existence during the settlement discussions in late 2008 and early 2009.  (Ex. 50.)  The letter also relies on inaccurate information.  It includes a photograph of a BWR sign which appears to be yellow, but is actually red.   (Ex. 50, 51.)  It also includes a photograph which purports to show the interior of a BWR restaurant which appears to be painted mostly a shade of yellow, but the photograph actually depicts mostly the walls and ceiling of the shopping mall in which the restaurant is located, not the restaurant itself.  (Ex. 50.)

Even in this letter in which BWW unilaterally changed the terms of the Settlement Agreement it had previously prepared, it still deems the BWR name and amended registered mark acceptable (Ex. 49.):

**b.  On web pages:**

 




**Confusion**

When BWR began doing business in Ohio in 1988 under the name Buffalo Wings & Rings, BWW was operating under the name "BW-3." (Ex. 9, 10, 13.)  There is no evidence of any confusion between the names Buffalo Wings & Rings and BW-3.  When BWW changed its name to Buffalo Wild Wings in 1997,[4] there was bound to be some limited name confusion over the restaurants since both included the words "buffalo" and "wings" in their name and both were casual restaurants which featured buffalo chicken wings.  (Ex. 32 p.11, 13.)

Despite the fact that BWW operates more than 600 restaurants in 40 states, it has come forward with no market survey evidence regarding consumer confusion in the marketplace.  Rather, BWW has attempted to come forward with anecdotal evidence of a few dozen reports of alleged confusion, (Doc. Nos. 21, ¶ 39; 51, p.18-19; 52-21.), in a market where millions of customers are served annually.  (Ex. 2, 141:16-24; Ex. 52, 18:6-22:10, Ex. 53, 17:3-18, Ex. 54, 17:12-20.)

---

[4] (Ex 1, p.1; Ex. 2, 27:13-20; Ex. 3, 41:18-42:7.)

The confusion alleged by BWW generally falls into three categories:  (1) reports to BWW of a consumer confusing the names of the restaurants; (2) anonymous web postings regarding the two restaurants; and (3) reports of confusion from non-consumers such as vendors, suppliers and directory assistance operators.  (Doc. Nos. 21, ¶ 39; 51, p.18-19; 52-21.)  There is no evidence of any confusion between the two design marks used by each restaurant.  (Ex. 2, 140:3-19.)  BWW has also not identified a single consumer who was confused by any similarity between the trade dress of the two restaurants.  (Doc. Nos. 21, ¶ 39; 51, p.18-19; 52-21.)

## ARGUMENT

### I.      STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of proving that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden may be satisfied by presenting specific evidence on a particular issue or by indicating "an absence of evidence to support the non-moving party's case."  *Id*. at 325.  Once the movant has met this burden, the non-movant cannot simply rest on the bare allegations of the pleadings; rather, that party must set forth specific, admissible, material facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## II.     LEGAL STANDARDS FOR TRADEMARK INFRINGEMENT CLAIMS.

A plaintiff establishes a claim for trademark infringement by proving that it has 1) a valid, protectable mark and 2) that there is a likelihood of confusion between its mark and the defendant's mark. *B&B Hardware, Inc. v. Hargis Indus., Inc.,* 569 F.3d 383, 389 (8th Cir. 2009).   BWW cannot meet either of these fundamental requirements of a trademark infringement claim.

A mark is entitled to trademark protection only if it is distinctive. *Schwans IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006). To determine whether a mark is distinctive, it is categorized as either "generic, descriptive, suggestive, or arbitrary." *Id.* "A generic term can never function as a trademark because it refers to the common name or nature of the article." *Id.* Similarly, a descriptive mark is ordinarily not protectable because it "conveys an immediate idea of the ingredients, qualities or characteristics of the goods . . . ." *Frosty Treats, Inc. v. Sony Computer Entertainment America, Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005). A descriptive mark becomes distinctive only upon acquiring secondary meaning. *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985). "Suggestive marks, which require imagination to reach a conclusion as to the nature of the goods, and arbitrary . . . marks, which are inherently distinctive, are entitled to immediate protection without establishing secondary meaning." *Id.*

A court considers six factors to determine whether there is a likelihood of confusion:

> (1)     The strength of the plaintiff's mark;

(2)     The similarity between the plaintiff's and defendant's marks;

(3)     The degree to which the allegedly infringing product competes with the plaintiff's good;

(4)     The alleged infringer's intent to confuse the public;

(5)     The degree and care reasonably expected of potential consumers; and

(6)     Evidence of actual confusion.

*Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005).   These factors guide a court's analysis, but the ultimate determination of whether confusion is likely is not to be mechanically determined through rigid application of the factors.   *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005).   "[T]he test of likelihood of confusion encompasses any type of confusion, including confusion as to origin, source, sponsorship, affiliation or connection."   *Eniva Corp. v. Global Water Solutions, Inc.*, 440 F.Supp.2d 1042, 1049 (D. Minn. 2006).

This case involves a weak, descriptive mark, with an even weaker infringement claim against a mark that was in-use, registered and had obtained incontestable status years before BWW represented to the USPTO that it first began using its marks.   Under such circumstances, BWW's claims fail as a matter of law.

## III.   BWW CANNOT ESTABLISH THAT ITS LEGAL RIGHTS IN ITS NAME OR MARKS ARE LEGALLY SUPERIOR TO BWR.

### A.     BWW'S Trademark Infringement Claim Fails where BWR has a Priority of Right to Use its Incontestable Trademark.

A certificate of trademark registration for a mark is prima facie evidence of the validity of the mark shown in the registration, the registration of the mark, the registrant's

ownership of the mark, and the registrant's exclusive right to use the mark in commerce for the covered goods and services.  15 U.S.C. § 1057(b).  A mark that meets certain requirements, primarily continuous, uncontested use for five years after registration, becomes "incontestable" upon filing of a declaration with the USPTO.  15 U.S.C. § 1065; *see Woodroast Systems, Inc. v. Restaurants Unlimited, Inc.* 793 F. Supp. 906, 912 (D. Minn. 1992).  With respect to incontestable marks, the Lanham Act provides that registration is conclusive evidence of the registrant's exclusive right to use the mark.  15 U.S.C. § 1115(b); *see Park'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196 (1985).  An incontestable mark may be used either offensively to support injunctive relief or defensively in order to prevent injunctive relief.  *Park'n Fly*, at 204-205.

In the present case, BWR's registered mark obtained incontestable status no later than May 26, 1995, more than *ten years* before BWW first claimed infringement.  An incontestable mark is not subject to attack on the grounds that it is merely descriptive.  *Id*. at 196-197.  The only basis under the Lanham Act for successfully challenging an incontestable trademark are the enumerated defenses in 15 U.S.C. § 1115(b).  BWW has not even alleged, let alone come forward with prima facie evidence to establish any of these enumerated defenses to an incontestable mark.

In addition to having an incontestable-registered mark, BWR also has established continuous use of the mark since 1988, long before BWW changed its name to "Buffalo Wild Wings" in 1997.  More importantly, perhaps, BWW has not proffered any evidence that BWR ever abandoned its mark.  In general, the party claiming ownership of a mark must be the first to use the mark in commerce.  T. McCarthy, *McCarthy on Trademarks*

*and Unfair Competition*, § 16.1 (4th ed. 1998).  BWR has produced photographs of its first store using the name as well as numerous other stores using the name prior to 2005. (*See* above BWRLLC00134526; Ex. 27, 30.)  It has also produced its first menus, marketing materials and numerous documents establishing the actual use of the '637 Mark in commerce.  (*Id*.; *See* above BWRLLC00130548.)

As a matter of law BWW simply cannot prevent BWR from using its incontestable registered mark or any other mark which creates the same commercial impression.  *See First Bank v. First Bank System, Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996).  BWW's own USPTO filings conclusively establish that the marks it claims have been infringed have only been in use since 1997.  (Ex. 18-25.)  BWR's '637 Mark was registered in 1989 and became incontestable at least two years before BWW commenced use of the marks at issue.  (Ex. 31.)  Accordingly, BWW's infringement claims arising out of BWR's use of the '637 Mark or of any other mark that conveys the same commercial impression to consumers must be denied.  *See Nat'l Assoc. for Healthcare Communications, Inc. v. Central Ark. Area Agency on Aging, Inc.*, 257 F. 3d 732, 736 (8th Cir. 2001) (upholding summary judgment in trademark case in market where defendant had prior use).

### B.   BWW'S Trademark Infringement Claims are Barred by its Disclaimer of "Buffalo" and "Wings."

As set forth above, it is undisputed in this case that BWW has repeatedly and expressly disclaimed any right to the words "buffalo" and "wings."  (Ex. 14, 18, 22, 23, 24, 25.)  Indeed, the USPTO has expressly required BWW to do so in order to receive registration for its marks which contain these descriptive terms.  (*Id*.; Ex. 26).  Since

these are the two words that BWW and BWR have in common in their names, BWW cannot possibly base a trademark infringement claim on two words that it has expressly disclaimed and has no exclusive right to use.

The effect of a disclaimer is to preclude any claim that a federal registration gives the party any exclusive right in those disclaimed words. *See Lonestar Steakhouse and Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 362 (11th Cir. 1997); *see also* 15 U.S.C. § 1056. While the mark should be viewed as a whole, where the disclaimed words are part of a multiple word mark, the court must focus on the non-disclaimed word or term in determining whether the mark is legally protectable. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529-1530 (4th Cir. 1984). In this case, the only word not disclaimed by BWW is "Wild." There is no claim that BWR has ever used the term "Wild" as part of its name or marks. Any alleged infringement or confusion by BWR of Buffalo Wings & Rings arises entirely from the disclaimed terms "Buffalo" and "Wings." BWW has no legally-protected right in these words, has expressly disclaimed an exclusive right to use these words, and cannot base its trademark infringement claim merely on contemporaneous use of generic or descriptive words.

The USPTO properly required BWW to disclaim the terms "Buffalo" and "Wings" because they are merely descriptive or generic terms for a particular type or style of chicken wings. *See In Re Precision Cuts, Inc.*, 131 Fed. Appx. 288, 2005 WL 1111753, at 291-292 (Fed. Cir. May 11, 2005) (upholding USPTO's finding that term "precision cuts" was generic for barbershop services could not be registered without a disclaimer). The Eighth Circuit has consistently rejected infringement claims like this

one where the parties share one or two generic or descriptive terms. *Luigino's v. Stouffer Corp.*, 170 F.3d 827, 830-831 (8th Cir. 1999) ("Lean 'N Tasty" not confusingly similar to "Lean Cuisine"); *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626-27 (8th Cir. 1987) (finding that "Oatmeal Raisin Crisp" and "Apple Raisin Crisp" are unlikely to be confused).

While a disclaimer of words does not necessarily mean that the registrant cannot use or protect the words as part of a larger word mark or a words plus design mark, here BWW is seeking to affirmatively enforce an *exclusive right* to use these disclaimed words against another party. BWW simply has no legal right to the exclusive use of these words, let alone a trademark infringement claim arising out of a mark that includes two disclaimed words and a word that BWR does not even use. To hold otherwise would effectively give BWW an exclusive right to use the descriptive term "buffalo wings" in the marketplace and impact numerous other restaurants that use these descriptive words as part of their names.

For these same reasons, BWW's claims seeking injunctive relief requiring action by the USPTO against BWR marks or applications (Counts 4-6) must fail. All of these claims assume that BWW has a superior and exclusive right to use the term "Buffalo Wings" when the record is directly to the contrary.

## IV. BWW CANNOT ESTABLISH CONSUMER CONFUSION IN THE MARKETPLACE AS A MATTER OF LAW.

While the Court need not reach the confusion issue where BWR has established priority of use, registration and incontestability of the allegedly infringing mark, BWW

has also failed to establish consumer confusion. In order to prevail on a trademark infringement claim, a plaintiff must prove a likelihood of consumer confusion which is the "hallmark of any trademark infringement claim." *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1308 (8th Cir. 1997) (quoting *Polymer Tech. Corp. v. Nimran*, 37 F.3d 74, 80 (2nd Cir. 1984)). In addition, the plaintiff must establish a causal link between any consumer confusion and the defendant's allegedly infringing conduct. *Blue Dane Simmental Corp. v. American Simmental Ass'n.,* 178 F.3d 1035, 1042 (8th Cir. 1999) (in order to recover money damages under the Lanham Act a plaintiff must establish a "causal link" between defendant's violation and those damages).

BWW cannot establish as a matter of law a likelihood of consumer confusion or that any such confusion was caused by misuse of any trademarks or proprietary trade dress by BWR. In a case involving restaurants serving millions of customers a year throughout the United States, BWW relies on a few dozen anecdotal reports of alleged name confusion, most of which are based on inadmissible evidence. BWW has produced no market survey evidence or anything else that would establish consumer confusion in the relevant marketplace. With respect to causation, BWW cannot meet its burden of establishing that any of the alleged name confusion was caused by unlawful conduct by BWR, as opposed to BWW's decision to change its name from "BW-3" to the much weaker "Buffalo Wild Wings."

A.      **There is insufficient evidence of confusion.**

BWW is one of the largest restaurant chains in the United States with more than 660 restaurants throughout the country. While much smaller, BWR also has more than

50 restaurants in more than a dozen states throughout the country. BWW serves millions of customers annually and claims to sell more than 9 million chicken wings a week. (Ex. 3, 56:18-57:4, 58:23-59:9). According to one of BWW's restaurant managers a single restaurant serves approximately 2000-3000 customers per week, and BWW has more than 650 restaurants. (Ex. 59, 14:21-16:16.) In such a case, involving a huge marketplace, anecdotal evidence of a few dozen reports of alleged confusion involving highly descriptive word marks is insufficient as a matter of law. *See Co-Rect Products,* 780 F.2d at 1333) (plaintiff's "self serving testimony" that some of his customers were confused was insufficient as a matter of law). Such anecdotal, hearsay evidence of sporadic confusion has been consistently rejected by the Eighth Circuit Court of Appeals and in this district. *Frosty Treats,* 426 F.3d at 1009; *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996); *Cellular Sales, Inc. v. Mackay*, 942 F. 2d 483, 486 (8th Cir. 1991); *e.g.*, *Vitek Systems, Inc. v. Abbott Labs*, 675 F.2d 190, 193 (8th Cir. 1982).

In *Vitek*, the Eighth Circuit rejected exactly the type of evidence presented here--relatively few reports of actual confusion without market survey evidence:

> [Plaintiff] next argues that there was evidence of actual confusion in the record and that the district court's finding in view of that evidence indicates that the district court used an erroneous standard. Much of the evidence was the testimony of [Plaintiff] employees and consultants to the effect the customers had told them they were confused by the marks. The district court found that the testimony was 'ambiguous at best and not credibly probative of the asserted confusion.' On appeal Vitek highlights extracts of various witness's testimony to support its argument that the district court finding is clearly erroneous. After a review of the entire transcript we disagree.

> Seven of [Plaintiff]'s witnesses were employees or consultants of [Plaintiff]. These witnesses testified, in effect, the customers had told them they were confused by the similarity of the marks. Such testimony was hearsay in nature and the district court properly gave it little weight. In addition, the district court could refuse to credit the uncorroborated testimony of such interested persons.

675 F.2d at 193 (internal citations omitted).

Similarly, in *Cellular Sales*, the Eighth Circuit again rejected a showing of confusion based on the plaintiff's reports of confusion without a market survey. The Court noted the fact that there was "no survey" and held that "[m]ore is needed to establish the necessary consumer association than merely the self-serving testimony of the plaintiff that some of his customers were confused." 942 F.2d at 486 (quoting *Co-Rect Prods.,* 780 F.2d at 1333).

Market survey evidence is the best and most effective evidence of consumer confusion. *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (citing numerous cases for the proposition that courts give substantial weight to surveys); *Calvin Klein Cosmetic Corp. v. Lenox Labs., Inc.,* 815 F.2d 500, 504 (8th Cir. 1987) (holding that establishing customer confusion requires recreating the consumers purchasing decision in the relevant marketplace). While such evidence may not be required in every trademark infringement case, where the relevant "marketplace" involves millions of customers and hundreds of restaurants throughout the country, a few dozen or even a few hundred reports of "confusion" are "*de minimus*" in the marketplace as a whole. *See George & Co., LLC v. Imagination Entern. LTD,* 575 F.3d 383, 399 (4th Cir. 2009)

(claim of consumer confusion failed as a matter of law where 500,000 products were sold with only a handful of reports of confusion).

As noted by the Eighth Circuit in *Calvin Klein*: "A realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine not what it would do, but what a reasonable purchaser in market conditions would do."  815 F.2d at 504.  Only a valid and reliable marketplace survey can show whether consumer confusion exists in market conditions in a case like this.

Similarly, in Professor McCarthy's leading treatise he makes clear that confusion must be established in reference to the number of consumer transactions involved:

> Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence.  If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

*McCarthy on Trademarks* at § 23:14 (4th ed. 2010).

This case involves a massive, multistate marketplace within which BWW must establish the likelihood of consumer confusion through reliable, admissible evidence. BWW has failed to do so by survey or otherwise.

## B.   BWW has failed to establish a causal link between the alleged infringing conduct and any confusion.

While BWR believes that BWW has failed to establish consumer confusion in the marketplace as a matter of law, even assuming that it has established such confusion, it

cannot establish that BWR caused any confusion.  In fact, if anything, it was BWW's decision to change from its well-known name of "BW-3" to "Buffalo Wild Wings" that has caused any name confusion between the restaurants.

The plaintiff in a trademark infringement claim must establish a "causal connection between the confusion and injuries suffered." *St. Croix Printing Equipment,* 578 F. Supp. 2d at 1198 (citing *LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1489 (D. Minn. 1996)).  Without such a causal link, an infringement claim fails as a matter of law. *Id*.

According to its own description of its history, BWW operated under the name "BW-3" when BWR started doing business in Ohio in 1988 and obtained its federally-registered mark including the name "Buffalo Wings & Rings" in 1989.  (Ex. 1, p.1; Ex. 9, 10, 11, 12; 16, 17; Ex. 27, 28, 29, 30, 31, 32 p.12-13; Ex. 2, 18:13-19:24).  It also cannot be disputed that BWW again changed the brand name of its restaurants to "Buffalo Wild Wings" in 1997, almost ten years after BWR began using its brand name and obtaining the registered mark.  (Ex. 1, p.1; Ex. 2, 27:13-20; Ex. 3, 41:18-42:7; Ex. 4, p.1.)  Given such undisputed facts, BWW cannot possibly claim that it was any conduct of BWR that caused any confusion between the names or marks of the two restaurants.  Had BWW kept its well known "BW-3" name, there likely would be no confusion.  Indeed, BWW's own documents show that several years after the change from BW-3 to Buffalo Wild Wings most of its consumers still knew the restaurant as BW-3.  (Ex. 55.)

BWW cannot establish the causal link between the alleged infringing conduct and any confusion between the name and marks of the two restaurants.   Under such

circumstances, summary judgment is appropriate.  *See St. Croix Printing*, 578 F. Supp.2d at 1198.

## V.     BWW CANNOT ESTABLISH TRADE DRESS INFRINGEMENT.

BWW's trade dress infringement claims under the Lanham Act fail for many of the same reasons as its trademark infringement claims.   Indeed, BWW has an even weaker argument that its trade dress is legally protectable or that BWR's trade dress is confusingly similar.

### A.     **BWW's Claimed Trade Dress has been a Moving Target**.

BWW's claimed trade dress has been a "moving target" throughout this action. *See HI Limited Partnership & Hooters of America, Inc. v. Winghouse of Florida, Inc.*, 347 F. Supp. 2d 1256, 1257-1258 (M.D. Fla. 2004) (dismissing Hooter's trade dress claim as a matter of law where Hooter's had provided "moving target" definitions of its trade dress).   BWW has simply been unable to provide a coherent and consistent definition of its own "distinctive" trade dress.

BWW initially set forth the alleged features of its trade dress in its Complaint, Amended Complaint and answers to interrogatories.  (*See* Doc. No. 1; Doc. No. 21, ¶ 18; Delaney Decl., ¶ 61.)  Several months later, after it became clear through discovery that BWR did not use a number of the alleged features of BWW's trade dress, BWW changed its interrogatory answers to include a different description of its trade dress.   The dramatic changes, including deletions, additions, and extensive revision -- all tending to make BWW"s claims more vague, general and broad – are reflected by comparing

BWW's original Complaint, Doc. No. 1 at ¶ 19, and its recently-filed Second Amended Complaint, Doc. No. 142 at ¶ 19.

BWW's proposed trade dress expert, Christopher Muller, moved the target yet again, adding several trade dress features that were not in BWW's definition of its own trade dress, including the packaging of BWW's sauces and its "service style." (Ex. 37., 7-8.) Finally, despite all these modifications and adjustments, BWW's senior executives have testified that they do not believe that BWW has correctly defined its trade dress in this action or included all of its elements. (Ex. 3, 205:6-23, 206:1-10; Ex. 60, 41:4-9)

In sum, BWW has claimed at least four different versions of its "trade dress" during the course of this action. The fact that BWW cannot even define its own trade dress in a consistent or coherent manner speaks volumes, and answers the question of whether its trade dress is entitled to legal protection under the Lanham Act. The very definition of distinctive trade dress is that a consumer knows it when they see it. If BWW cannot even define its trade dress, how is a consumer to do so?[5] Like the Court in

---

[5] Aside from BWW's failure to coherently define its trade dress in this action, the evidence in this action makes clear that there is substantial variation in the "look and feel" from one BWW restaurant to another. (*See, e.g.*, Ex. 3 at 151:1-153:8.) Indeed, approximately ten percent of BWW's restaurants are decorated in an entirely different style than their more current restaurants – using different colors, layouts, signage, furniture and bar areas, among other items. (*See id.*)

the *Hooters* case, this Court should reject BWW's trade dress claim as a matter of law.

**B.      BWW Cannot Meet its Burden of Establishing its Trade Dress Claim.**

BWW's trade dress is not federally registered and therefore is not entitled to any presumptions of validity or exclusivity.  Indeed BWW has never attempted to register its trade dress despite its claim that its trade dress became "distinctive" in 2001.  While courts have recognized that the unregistered trade dress of a restaurant may be protectable in limited circumstances, these cases are rare.  BWW's vague assertion of "heavy emphasis on sports and television," "wide open interior with spacious feel," and "prominent use of the color yellow," fall well short of the legal standard.

BWW has the burden of establishing that its trade dress is non-functional and is inherently distinctive or has acquired distinctiveness through secondary means.  *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 769 (1992).  Once eligibility for protection is demonstrated, the claimant can only establish liability by proving that the trade dress "creates a likelihood of confusion in consumers' minds as to the origin of the services."  *Id*. at 769-770.  Summary judgment is appropriate if the plaintiff fails to raise a genuine issue of material fact as to any one of these three required elements.  *Woodsmith Publishing Co. v. Meredith Corp*., 904 F.2d 1244, 1247 (8th Cir. 1990).

**1.      BWW's Alleged Trade Dress is Functional as a Matter of Law**.

In 2001, the Supreme Court observed that it was a "well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc*., 532 U.S. 23, 29 (2001).  Trade dress is nonfunctional if it is an arbitrary embellishment primarily adopted for purposes of

36

identification and individuality. *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 873 (8th Cir. 1994) (*citing Prufrock, Ltd. v. Lasater*, 129, 781 F.2d 133 (8th Cir. 1986)).  But if the trade dress is an important ingredient in the commercial success of the product, it is clearly functional.  *Id.*

The functionality doctrine serves to prevent a competitor from monopolizing a useful product feature in the guise of identifying itself as the source of the product. *Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Management, Inc.*, 226 F.3d 944, 948 (8th Cir. 2000); *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1049-1050 (D. Minn. 2003) (finding cooking equipment, counter tops, awnings, menus, utensils, and uniforms as functional and granting defendant summary judgment).  Further, methods of marketing and doing business are not protectable**.**  *Prufrock,* 781 F.2d at 132 ("It would be ludicrous ... to suggest that in our free enterprise system, one producer and not another is permitted to take advantage of [a] marketing approach to enhance consumer reception of its product.") (citations omitted).

In general, Courts have rejected as a matter of law claims of restaurants for trade dress protection even for restaurant concepts that are far more distinctive than BWW, including Planet Hollywood and Hooters.  *HI Limited Partnershup & Hooters*, 347 F. Supp. 2d at 1258-1259 (dismissing Hooter's trade dress claim as a matter of law); *Planet Hollywood Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 891 (N.D. Ill. 1999) (denying Planet Hollywood trade dress protection for "Hollywood theme"); *see also Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 141 (4th Cir. 2000) (upholding dismissal of restaurant trade dress claim on summary judgment where

plaintiff did not establish it had an "exclusive proprietary interest" in old English ale house theme).

While functionality may be a fact issue in some cases, it is properly decided as a matter of law on summary judgment where there are no genuine fact disputes. *See Rainbow Play Systems, Inc. v. GroundScape Technologies, LLC*., 364 F. Supp. 2d 1026, 1038 (D. Minn. 2005) (holding that features of playground set were functional in granting defendant summary judgment on trade dress claim).  Assuming, *arguendo*, that BWR uses each of the features that BWW claims as its trade dress to eliminate any fact issues, BWW cannot meet its burden of proving that the features are non-functional as a matter of law.

Literally every feature of BWW's claimed trade dress is functional and such features are used by countless other casual restaurants/sports bars.  (Ex. 32, p.17-18.)  As the Eighth Circuit indicated in *Prufrock*, it would be "ludicrous" to suggest that other restaurants cannot use big screen televisions in "open places" or "bold font" to advertise promotions.   An "open interior with a spacious feel" makes dining more comfortable for customers and makes it easier for servers move throughout the restaurant.  It also makes it easier to see the multiple televisions which are standard fare for any sports bar.  (Ex. 3, 207:13-19.)  BWW's claim that it uses "bold" font and patterns makes these items easier to read and see, as does the use of the primary color yellow (which BWW's CEO admits, *Id*. 98:16-100:6).  Finally, the use of buffalo images by restaurants that feature buffalo-style chicken wings is common practice and is descriptive of the type of food featured by the restaurant.  (Ex. 32.)

### 2.      BWW Cannot Establish Secondary Meaning.

Once a feature is determined to be functional, then "secondary meaning is irrelevant because there can be no trade dress protection in any event." *TrafFix Devices,* 532 U.S. at 26.  Because the features of BWW's claimed trade dress are functional as a matter of law, there cannot be any secondary meaning.  Moreover, BWW has come forward with no evidence of secondary meaning in the marketplace through a market survey or otherwise. *See Hartco Engineering, Inc. v. Wang's Int'l, Inc.,* 142 Fed. Appx. 455, 460 (Fed. Cir. 2005) (market survey evidence is "the most direct and persuasive evidence for establishing secondary meaning.").

### 3.      BWW Cannot Establish Consumer Trade Dress Confusion Caused By BWW.

Even if BWW's generic trade dress is somehow considered legally protectable, it cannot establish consumer confusion over trade dress caused by any infringing activity of BWR.  As set forth above, BWW has failed to come forward with any market survey evidence showing confusion in the marketplace.   While some name confusion is inevitable given the descriptive nature of both names, BWW has literally come forward with no evidence, survey or otherwise, which shows that there is likelihood of consumer confusion over trade dress.

## VI.    BWW HAS NO CAUSE OF ACTION FOR "FALSE MARKING."

In Count 3 of its Complaint, BWW asserts a claim for "false marking" arising out of the allegedly improper use of the trademark registration symbol ("®") in connection with BWR's amended mark.  There is simply no cause of action arising out of the "improper" use of the ® symbol.  (Ex. 32, p.15.)  Moreover, the USPTO has already determined that the amended mark is a non-material alteration of the original registered '637 Mark.  (Ex. 36.)  Accordingly, there was nothing improper regarding BWR's use of the ® symbol and certainly nothing that gives rise to a cause of action.

## VII.   BWW'S CLAIMS OF INFRINGEMENT ARE BARRED BY THE DOCTRINES OF LACHES AND ESTOPPEL.

It has been 22 years since BWR first filed an application for federal registration of its mark which featured the name "Buffalo Wings & Rings" and a forward facing buffalo head.  Despite the fact that BWW was doing business under various names throughout this entire period, it never once objected to BWR's name or registered mark until this lawsuit was filed in 2009.  Even BWW's cease and desist letter in 2008 only objected to trade dress issues primarily relating to the use of the color yellow or gold.  (Ex. 43.)  In subsequent discussions between the parties, BWW expressly represented that BWR's name and amended red logo were "acceptable."  (Ex. 46-49.).

As set forth above, the undisputed record shows that BWR has been using its name and registered '637 Mark since at least 1988.  BWW witnesses have consistently acknowledged that they were aware of BWR for many years before any claims of infringement were ever alleged.  (Ex. 3, 294:9-20; Ex. 56, 44:2-16.)  BWW's own

internal documents establish that it considered BWR a competitor in the marketplace since at least 2000.   (Ex. 57; Ex. 38, 37:13-44:13.)   BWW's new-found claim of infringement after the parties have competed in the marketplace for decades is barred as a matter of law by the doctrines of laches and estoppel.

The defenses of estoppel and laches are interrelated and require only passive consent to use of an allegedly infringing mark, rather than any affirmative representation. See *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club*, No. 00-2317, 2002 WL 1763999, at * 11 (D. Minn. July 26, 2002).   The right to estoppel exists where the defendant shows that: (1) it was misled by plaintiff's conduct to believe the plaintiffs did not intend to enforce its trademark rights against defendant; (2) it relied on such conduct; and (3) it will be materially prejudiced if plaintiff is permitted to enforce its trademark rights.  *Minnesota Mining & Mfg. Co. v. Beautone Specialties, Co., Ltd.*, 82 F. Supp. 2d. 997, 1005 (D. Minn. 2000).

Similarly, a trademark infringement claim is barred by the doctrine of laches where the plaintiff "inexcusably delayed" in asserting its trademark claim and the defendants suffered undue prejudice because of that delay.  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601-602 (8th Cir. 1999).

The record is devoid of any evidence explaining or excusing a delay of more than two decades before BWW claimed that BWR's name and registered mark infringed on its trademarks.  If BWR's name and registered mark are infringing now, then presumably they would have been infringing throughout the 1990s and into the 2000s.  Such delay is highly prejudicial because BWR has spent the past 20 plus years developing its restaurant

concept using its registered mark and the name contained within such mark.  Even when

BWW first started raising objections to BWR in 2008, its objections were limited to the

use of the color yellow and similar trade dress elements.  (Ex. 43.)  BWW never claimed

that BWR's name or registered mark were infringing.  (*Id*.)  In fact, immediately prior to

bringing this lawsuit, BWW repeatedly represented that the use of BWR's name is part of

its amended logo were "acceptable."  (Ex. 46-49.)  BWR relied on these repeated written

representations and conduct in adopting a modernized red logo for all of its signage,

menus and marketing items in its restaurants.  (Ex. 5, 88:5-89:10, 192-193, 199:1-21.)

It is inconceivable that the same company that specifically represented in early

2009 that the use of BWR's name and the amended registered mark was "acceptable," is

now seeking permanent injunctive relief from this Court preventing BWR from using its

name and registered mark on its more than 50 restaurants.  If the doctrines of laches and

estoppel do not apply in this case, it would be difficult to conceive of any case where

these defenses would apply.  All of BWW's claims are clearly barred by laches and/or

estoppel.

BWW has tried desperately in this case to create a theory to avoid the reality that

BWR has been using its name "Buffalo Wings & Rings" and its incontestable registered

trademark containing that name for more that twenty years, far longer than BWW has

used its 1997 mark "Buffalo Wild Wings."  Faced with the incontestable 1989 trademark

registration of the '637 Mark, the 1988 assumed name filing in Ohio, countless

photographs, menus, advertisements and other documents using the name and the

testimony of those with historical knowledge, BWW has concocted a theory that BWR's

restaurants were actually named "Wings & Rings" prior to 2005, and then it started using "Buffalo Wings & Rings."

It attempts to do so in several ways, none of which creates a genuine fact issue as to whether BWR has used the name "Buffalo Wings & Rings" since at least 1988. First, it uses the fact that the corporate name of the franchisor of the BWR restaurants was "Wings & Rings, Inc." It then uses documents or testimony that refers to the corporate or company name to suggest that the restaurants themselves were called "Wings & Rings." Second, it uses shorthand or abbreviated references in documents to "Wings & Rings" to suggest that is the actual restaurant name (usually ignoring other references on the same document to "Buffalo Wings & Rings"). Third, despite the fact that all BWR restaurants contain the name "Buffalo Wings & Rings" and/or the registered mark as part of their signage, BWW cites to one or two photographs which contain signage for "Wings & Rings" ignoring the fact that the signage also contains the registered mark with the name "Buffalo Wings & Rings."[6] Finally, and somewhat remarkably, all BWW executives testified in unison that they knew the restaurant as "Wings & Rings" even though some of BWW's own documents dating back as far as 2000 refer to full restaurant name. (Ex. 38, 37:13-44:13; Exs. 55, 57.)

Even if all of this "evidence" is taken at face value for purposes of summary judgment, however, it still does not create a fact issue as to whether BWR actually used

---

[6] In a prior filing with this Court, Doc. No. 115 p.8, BWW included a poor quality production of a photograph which appeared to show an older BWR restaurant with a "Wings & Rings" sign. The actual restaurant signage, however, also includes two representations of the '637 Mark containing the name "Buffalo Wings & Rings." (*See* Ex. 58.)

the name "Buffalo Wings & Rings" in the marketplace prior to 2005.  The fact that BWR's corporate name was "Wings & Rings, Inc." or that there are references to "Wings & Rings" in some documents or signage, or that some people referred to the restaurant as "Wings & Rings," does not mean that BWR did not use the name "Buffalo Wings & Rings."  Even when viewed in the light most favorable to BWW, the evidence relied on by BWW only shows that was BWR was also referred to on occasion as "Wings & Rings," not that it did not use the name "Buffalo Wings & Rings."  Only if the Court ignores numerous trademark registration documents, assumed name state filings and many other documents, photographs and testimony could it reach the conclusion that there are fact issues as to whether BWR ever used the name "Buffalo Wings & Rings" prior to 2005.

Finally, BWW's own Amended Complaint, repeatedly acknowledges that the restaurant chain operated under the name "Buffalo Wings & Rings" prior to 2005.  (Doc. No. 21 at ¶¶ 23-26).  There is no genuine issue of material fact as to whether BWR has used its name since at least 1988, and BWW's objection twenty years later is barred.

## VIII.   BWW'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW.

### A.      BWW'S "Unfair Competition" Claim Fails as a Matter of Law.

In Count 8 of its Second Amended Complaint BWW asserts a general claim for "Unfair Competition."  BWW has acknowledged in previous filings with this Court that its state law unfair competition claim arises out of the same facts as its trademark and trade dress infringement claims. (Doc. No. 51, 14). The Eighth Circuit has already determined that under Minnesota law, unfair competition is "not itself an actionable tort."

*Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1504 n.40 (8th Cir. 1992).  Rather than constituting a separate and distinct cause of action, unfair competition is a "general category of torts."  *Midwest Sports Marketing, Inc. v. Hillerich & Bradsby of Canada, Ltd.*, 552 N.W.2d 254, 267 (Minn. App. 1996).

The general category of unfair competition under Minnesota law may include "tortious interference with contract, improper use of trade secrets, and an employee's breach of a duty of loyalty to his or her employer."  *Midwest Sports Marketing*, 552 N.W.2d at 267.  BWW has not alleged *any* of these independent tort causes of action in this matter.  A general claim for "unfair competition" without even alleging one of the independent causes of action that fall within this category of torts fails as a matter of law.  *See Amerinet*, 972 F.2d at 1504 n. 40.

In addition to BWW's failure to allege a separate and distinct cause of action, any "unfair competition" claim is duplicative of its other claims.  In *LensCrafters,* the Court held that "if the underlying tort is duplicative of another Count of the Complaint, the claim for unfair competition cannot stand."  943 F. Supp. at 1490.  *LensCrafters* also involved Lanham Act claims and common law claims including "unfair competition."  *Id.* at 1487-1491.  After first noting that "unfair competition" is not a separate and distinct tort under Minnesota law, the Court expressly rejected any claim falling under the "unfair competition" category that is "duplicative" of other claims in the Complaint.  *Id*. at 1490-1491.  Because BWW *admits* that its unfair competition claim is duplicative of its trademark claims under the Lanham Act, its claim is barred, and BWR is entitled to summary judgment as to this Count.

### B.     BWW's Claim Under the MDTPA Must be Dismissed.

Count 7 of BWW's Second Amended Complaint contains a claim under the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.43 ("MDTPA").   This claim arises out of the same conduct that gives rise to BWW's claims for infringement under the Lanham Act.  (Doc. No. 49-1, ¶ 103).  A claim under the MDTPA is analyzed under the same legal standards as a Lanham Act claim.  *See Fair Isaac Corp. v. Experian Information Solutions, Inc.*, 645 F. Supp.2d 734, 762 (D. Minn. 2009).  Accordingly, this claim would fail for the same reasons set forth above regarding BWW's Lanham Act claims.

## IX.    BWW CANNOT ESTABLISH ANY ENTITLEMENT TO INJUNCTIVE RELIEF.

Regardless of whether the Court determines that summary judgment is appropriate on any of BWW claims, it must dismiss BWW's claim for relief in the form of permanent preventing BWR from using the name "Buffalo Wings & Rings" or the '637 Mark.[7] Because this name is the prominent feature of BWR's registered mark, such relief would necessarily prevent BWR from using its registered '637 Mark and effectively cancel the Mark.  Any such relief is precluded as a matter of law because BWR's mark including its name has obtained incontestable status under the Lanham Act, and BWW has failed to even allege, let alone establish, any of the statutory grounds for overcoming the presumed

---

[7] BWW also seeks monetary relief based on an equitable "reasonable royalty" theory.  If any of BWW's claims survive summary judgment, BWR will seek to exclude any claim for monetary relief on the grounds that the "reasonable royalty" theory used by its damage expert is not recognized in trademark infringement cases where the parties do not have a previous licensing relationship.

validity of BWR's registered mark. *See Pinnacle Pizza Co., Inc. v. Little Caesar Enterprises, Inc.,* 598 F.3d 970, 980 (8th. Cir. 2010) (affirming summary judgment where plaintiff failed to establish statutory grounds for cancellation of mark).

Injunctive relief that would preclude BWR from using its incontestable registered mark is improper as a matter of law. *See First Bank* 84 F.3d at 1044-1047 (permanent injunctive relief properly denied where plaintiff failed to establish priority of use of its mark over defendant's previously registered mark). Accordingly, BWW's claim for injunctive relief must be dismissed on summary judgment.

## CONCLUSION

For the foregoing reasons, BWR respectfully requests an Order granting its Motion for Summary Judgment.

**BASSFORD REMELE**
*A Professional Association*

Dated:  September 1, 2010          By s/Kevin P. Hickey
                                        Kevin P. Hickey (License #202484)
                                        Jonathan C. Marquet (License #0388774)
                                        Nicole A. Delaney (License #0390102)
                                  Attorneys for Defendant
                                  33 South Sixth Street, Suite 3800
                                  Minneapolis, Minnesota  55402-3707
                                  Telephone:   (612) 333-3000
                                  Facsimile:    (612) 333-8829

980342.doc